**Augustus E. HARVIN, Appellant,**
**v.**
**UNITED STATES of America,**
**Appellee.**
**No. 22317.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 20, 1970.

Reargued En Banc Jan. 21, 1971.

Decided May 7, 1971.

Opinions were filed by Fahy, Senior Circuit Judge, and MacKinnon and Tamm, Circuit Judges.

Part I of the opinion of Judge Fahy expressed the view of a majority of the court on the application of the Youth Corrections Act, and was concurred in by a majority of the court. Part II of the opinion of Judge Fahy, joined by Bazelon, Chief Judge, and J. Skelly Wright and Spottswood W. Robinson, III, Circuit Judges, dissented from the determination that a jury trial was validly waived.

Part I of the opinion of Judge MacKinnon expressed the view of a majority of the court on the application of the Youth Correction Act. Part II of the opinion of Judge MacKinnon, joined by McGowan, Leventhal, Robb, and Wilkey, Circuit Judges, expressed the conclusion that a jury trial was validly waived.

Judge Tamm, joined by Robb and Wilkey, Circuit Judges, agreed that a jury trial was validly waived. Judge Tamm, joined by J. Skelly Wright, Robb, and Wilkey, Circuit Judges, dissented from the majority's determination as to the application of the Youth Corrections Act.

Mr. David B. Lamb, Washington, D. C. (appointed by this court), for appellant.

Mr. John D. Aldock, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee.

## ON REHEARING EN BANC

Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges, sitting en banc.

## PER CURIAM:

Appellant was tried on an Information in the District of Columbia Court of General Sessions for petit larceny, in violation of D.C. Code § 22–2202, and for unlawful entry on property, in violation of D.C. Code § 22–3102. Both offenses are misdemeanors. He withdrew his demand for a jury, asked to be tried by the court, and was tried in that manner. He was acquitted of petit larceny and convicted of unlawful entry. The penalty for this offense, prescribed by Section 22–3102, is a fine not exceeding $100 or imprisonment in the jail for not more than six months, or both. He was sentenced, however, under the Youth Corrections Act, 18 U.S.C. § 5005, et seq., which provides that a youth sentenced under the Act shall be released conditionally under supervision on or before the expiration of four years from his conviction and shall be discharged unconditionally on or before six years from conviction.

Appellant contends that his sentence under the Youth Corrections Act caused the Court of General Sessions to have been without jurisdiction to try him because to support such a sentence his prosecution should have been by indictment. He contends additionally that his waiver of trial by jury was invalid since he had not previously been advised by the court that he could be sentenced under the Youth Corrections Act, entailing a possibly longer deprivation of liberty than is authorized by Section 22–3102 for the violation of which he was convicted. The District of Columbia Court of Appeals affirmed. Harvin v. United States, 245 A.2d 307 (D.C.App.1968). We allowed an appeal to this court.

Thereafter the court decided to hear the case en banc and the prior judgment of a division of the court was accordingly vacated. Following en banc hearing and consideration the court decided in favor of affirmance of the conviction.

Judges Bazelon, McGowan, Leventhal, Spottswood W. Robinson, III and MacKinnon join in Part I of Judge Fahy's opinion. Judges Bazelon, J. Skelly Wright and Spottswood W. Robinson, III join in Part II of Judge Fahy's opinion. Judges Bazelon, Fahy, McGowan, Leven-

thal and Spottswood W. Robinson, III join in Part I of Judge MacKinnon's opinion. Judges McGowan, Leventhal, Robb and Wilkey join in Part II of Judge MacKinnon's opinion. Judges Robb and Wilkey join in Judge Tamm's opinion and Judge J. Skelly Wright joins in Parts I–IV thereof.

Affirmed.

FAHY, Senior Circuit Judge, with whom Chief Judge BAZELON and Circuit Judges McGOWAN, LEVENTHAL, ROBINSON and MacKINNON concur in Part I, and Chief Judge BAZELON, and Circuit Judges WRIGHT and ROBINSON concur in Part II.

### I.

The Fifth Amendment provides in part as follows:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury * * *.

U.S.Const. amend. V.

The reference in the amendment to "or otherwise infamous crime" became the subject of several Supreme Court decisions, by which it was established that such a crime was one punishable by imprisonment for a term of years or at hard labor. Ex parte Wilson, 114 U.S. 417, 5 S.Ct. 935, 29 L.Ed. 89 (1885); Mackin v. United States, 117 U.S. 348, 6 S.Ct. 777, 29 L.Ed. 909 (1886); In re Claasen, 140 U.S. 200, 11 S.Ct. 735, 35 L.Ed. 409 (1891); United States v. Moreland, 258 U.S. 433, 42 S.Ct. 368, 66 L.Ed. 700 (1922). The decisions make clear that imprisonment for a term of years was one served in a state prison or penitentiary,[1] which, as early as 1865, 13 Stat. 500, see Ex parte Karstendick, 93

U.S. 396, 23 L.Ed. 889 (1876), Mackin v. United States, *supra*, was a place of confinement for those sentenced for an offense against the United States for a period longer than a year. By 18 U.S.C. § 4083, which traces its history to the Act of March 2, 1895, ch. 189, § 1, 28 Stat. 957, when Congress provided for a federal penitentiary, what the decisions made clear is now embodied in statute in the following form:

> Persons convicted of offenses against the United States * * * punishable by imprisonment for more than one year may be confined in any United States penitentiary.

With the law in this situation Rule 7 (a) of the Federal Rules of Criminal Procedure, adopted in 1945, carried forward the indictment requirement of the Fifth Amendment into the Rules as follows:

> An offense which may be punished by imprisonment for a term exceeding one year or at hard labor shall be prosecuted by indictment * * * [unless waived].

The original Committee Note to the Rule explains:

> This rule gives effect to the following provision of the Fifth Amendment to the Constitution of the United States: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury * * *". An infamous crime has been defined as a crime punishable by death or by imprisonment in a penitentiary or at hard labor, Ex parte Wilson, 5 S.Ct. 935, 114 U.S. 417, 427, 29 L.Ed. 89; United States v. Moreland, 42 S.Ct. 368, 258 U.S. 433, 66 L.Ed. 700, 24 A.L.R. 992. Any sentence of imprisonment for a term of over one

---

1. This is in contrast with confinement in a "house of correction * * * workhouse and bridewell * * *." Ex parte Wilson, *supra*, 114 U.S. at 428, 5 S.Ct. at 941. "Bridewell" is defined by Webster as follows:

> A house of correction standing till 1864 in London near Blackfriars Bridge. It was originally a palace built by Henry VIII. So called from St. Bride's (or Bridget's) well near by. A house of correction; loosely, a jail or prison.

Webster's New International Dictionary, 2nd Ed. Unabridged.

year may be served in a penitentiary, if so directed by the Attorney General, 18 U.S.C. [former] 753f [now §§ 4082, 4083]. * * * Consequently any offense punishable by imprisonment for a term of over one year is an infamous crime.

The Rule does not enlarge the requirement of an indictment beyond the "capital, or otherwise infamous crime," of the Fifth Amendment. It simply brings together in rule form the criteria which had been established by the Supreme Court for an "otherwise infamous crime," namely, an offense punishable by imprisonment for a term exceeding one year or at hard labor.

 From the foregoing it is clear that the offense which led to Harvin's sentence was not an infamous crime, for it carried a punishment by imprisonment not to exceed six months. Both adults and youths may be prosecuted for that offense on an information. The sentence imposed under the Youth Corrections Act does not alter the basis for the prosecution or transform the offense into an infamous one. A sentence under the Act it is true may result in the loss for more than a year of the liberty protected by the Due Process Clause of the Fifth Amendment,[2] and it is also true that the sentence available for an offense determines whether it is infamous.[3] The punishment, however, which determines the question of infamy is that which is related to the offense itself, in Harvin's case not to exceed six months imprisonment. That is the punishment which reflects the prevailing views of the governing authorities, represented by the law, as to the seriousness of the offense —its infamous or non-infamous character.[4]

A sentence under the Youth Corrections Act, in this case following conviction of a misdemeanor, is not a reflection by the legislature of the seriousness of that offense. Resort by the sentencing judge to the Youth Corrections Act was not to punish Harvin for the misdemeanor; it was to carry out the congressional purpose represented by the Act—to serve the interests of society and of selected youth offenders in preference to the statutory sentence for the misdemeanor. A sentence under the Act is not related to the offense itself, and it is the punishment for the latter which determines whether the prosecution must be by indictment. Sentencing under the

2. Jones v. Cunningham, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963); United States v. Fort, 133 U.S.App.D.C. 155, 409 F.2d 441 (1969); Pilkington v. United States, 315 F.2d 204 (4th Cir. 1963).

Pilkington involved Rule 11, Fed.R. Crim.P., governing a plea of guilty, which provides that the court shall

not accept such plea * * * without first addressing the defendant personally and determining that the plea is made voluntarily with understanding of the nature of the charge and the consequences of the plea. * * *

The court held that the Rule required the judge to advise the accused who pleads guilty that his sentence might be under the Youth Corrections Act, for:

However looked at, the deprivation of liberty for a possible period of six years is a greater penalty than a sentence for a lesser period.

315 F.2d at 208.

In Pilkington the court was not faced with the question we have. Moreover, we do not think Pilkington is to be interpreted as holding that the "greater penalty" under the Youth Corrections Act to which the court referred is such imprisonment as attaches infamy to an offense not otherwise infamous.

3. Ex parte Wilson, supra; accord, Mackin v. United States, supra.

4. In Mackin v. United States, supra, 117 U.S. at 350, 6 S.Ct. at 778, Justice Gray, in explaining the emphasis given to the form of punishment for an offense in determining its infamous character in his earlier opinion of Ex parte Wilson, supra, observed that:

The fifth amendment had in view the rule of the common law, governing the mode of prosecuting those accused of crime, by which an information by the attorney general, without the intervention of a grand jury, was not allowed for a capital crime, nor for any felony; as opposed to the rule of evidence disqualifying as witnesses those convicted of certain crimes.

Act rests upon those factors which led to its enactment—the youth of the offender, an appraisal by the judge, with the aid of other officials, of the youth's rehabilitative possibilities, the protection of society by the self-improvement of the youth through treatment and special care, with a goal of elimination of any criminal record due to the conviction, enabling the youth to go on with his life unimpaired by a criminal record. True, in pursuit of those aims a youth may be deprived of liberty for a longer period than an adult similarly entangled with the law, or for a longer period than another youth not sentenced under the Act. If this gives rise to questions of due process of law or of equal protection of the laws, those questions are quite apart from the Indictment Clause of the Fifth Amendment and Rule 7(a). The suggested questions are not answered either by an indictment or by an information.

It would be totally inconsistent with the statutory plan to ascribe to a sentence under the Act a result which turned the misdemeanor into an infamous offense when committed by a youth offender. To carry over to such a sentence the ancient method of categorizing a crime as infamous or non-infamous according to the severity of the sentence, and as a consequence to hold that the

5. It is hardly to be thought that every confinement for more than a year, though in a place other than a penitentiary, requires a grand jury indictment. Such a suggestion would cast doubt upon the permissibility of detention, in the absence of indictment, of juveniles, persons of unsound mind, and perhaps others.

6. In the dissenting opinion in United States v. Moreland, *supra,* 258 U.S. at 441, 42 S.Ct. 368, by Mr. Justice Brandeis, for himself and Chief Justice Taft and Mr. Justice Holmes, it was thought that a "hard labor" penalty added to imprisonment in a workhouse did not create infamy. Emphasis was placed on the rehabilitative purposes of the sentence; indeed the dissenters thought a workhouse sentence like that imposed in *Moreland* usually was not intended primarily as punishment at all.

sentence under the Act for possibly more than a year placed the misdemeanor in an infamous category, would be contrary to the reason which gave rise to the ancient usage, for a sentence under the Act simply does not denote that the misdemeanor was of so serious a character as to categorize it as infamous.[5]

I reach the same conclusion upon consideration of the Youth Corrections Act independently of the non-infamous penalty prescribed by Section 3102. For the Act does not permit a sentence under it to be served in a penitentiary.

I note preliminarily that we have recognized the nonpunitive character of confinement under the Act.[6] Carter v. United States, 113 U.S.App.D.C. 123, 306 F.2d 283 (1962). We there upheld the application of the Act to a youth convicted of a crime for which an adult could not be imprisoned in excess of one year. We commented:

> [T]he basic theory of [the] Act is rehabilitative and in a sense this rehabilitation may be regarded as comprising the *quid pro quo* for a longer confinement but under different conditions and terms than a defendant would undergo in an ordinary prison.

113 U.S.App.D.C. at 125, 306 F.2d at 285.[7] It is true that in In re Gault, 387 U.S. 1, 27, 49–50, 87 S.Ct. 1428, 18

The discussion by Mr. Justice Brandeis is a telling argument for holding that the development illustrated by the Youth Corrections Act is not to be considered as attaching infamy to offenses which led the judge to resort to the Act. And nothing in the majority opinion in *Moreland* is to the contrary, for the differences between the majority and the dissenters centered solely on the significance of the sentence to hard labor. The majority considered hard labor in a workhouse carried infamy. The dissenters considered that the labor involved in a workhouse was not comparable to that in a penitentiary, and, therefore, not a hallmark of infamy as a penitentiary sentence would be.

7. Support for this position was found in the quoted portion of the opinion in Cunningham v. United States, 256 F.2d 467, 472 (5th Cir. 1958), which similarly

L.Ed.2d 527 (1967), the Court cautioned against a disregard of the substantive effect of juvenile detention when considering labels given to procedures leading to confinement,[8] and, I might add, when considering the nature of the detention itself. The Court stated:

> [I]n over half of the States, there is not even assurance that the juvenile will be kept in separate institutions, apart from adult "criminals." In those States juveniles may be placed in or transferred to adult penal institutions after having been found "delinquent" by a juvenile court.

387 U.S. at 50, 87 S.Ct. at 1455. But under the Federal Youth Corrections Act a youth offender cannot be placed in a penitentiary.[9] The sentence must be served "under different conditions and terms than a defendant would undergo in the ordinary prison."[10] Carter v. United States, *supra*.

The Act provides:

§ 5011. Treatment

Committed youth offenders not conditionally released shall undergo treatment in institutions of maximum security, medium security, or minimum security types, including training schools, hospitals, farms, forestry and other camps, and other agencies that will provide the essential varieties of treatment. The Director [of the Bureau of Prisons] shall from time to time designate, set aside, and adapt institutions and agencies under the control of the Department of Justice for treatment. Insofar as practical, such institutions and agencies shall be used only for treatment of committed youth offenders, and such youth offenders shall be segregated from other offenders, and classes of committed youth offenders shall be segregated according to their needs for payment.

Added Sept. 30, 1950, c. 1115, § 2, 64 Stat. 1087.

Under Section 5015(b) the Director "may transfer at any time a committed youth offender from one agency or institution to any other agency or institution," [11] but

---

rejected due process and equal protection objections to the Act, reasoning that the Act:

> [P]rovides for and affords youthful offenders, in the discretion of the judge, not heavier penalties and punishment than are imposed upon adult offenders, but the opportunity to escape from the physical and psychological shocks and traumas attendant upon serving an ordinary penal sentence while obtaining the benefits of corrective treatment, looking to rehabilitation and social redemption and restoration.

*See also* Johnson v. United States, 374 F.2d 966 (4th Cir. 1967); Brisco v. United States, 368 F.2d 214 (3d Cir. 1966); Kotz v. United States, 353 F.2d 312 (8th Cir. 1965); Eller v. United States, 327 F.2d 639 (9th Cir. 1964); Rogers v. United States, 326 F.2d 56 (10th Cir. 1963). The views expressed in *Carter* as to the nature of a sentence under the Youth Corrections Act do not rest upon the fact that the prosecution was on an indictment.

8. *See also* In re Winship, 397 U.S. 358, 365–366, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

9. In so holding we find ourselves in respectful disagreement with the decision in United States v. Reef, 268 F.Supp. 1015 (D.Colo.1967).

10. *See* In re Wilson, 438 Pa. 425, 264 A.2d 614, 617 (1970), where the court in appraising an equal protection argument in relation to juvenile detention, remarked that:

> It is our view that there can be no constitutionally valid distinction between a juvenile and an adult offender which justifies making one of them subject to a longer maximum commitment in the same institution for the same conduct.

The state act was nevertheless upheld under the condition that the "longer commitment will result in the juvenile's receiving appropriate rehabilitative care and not just in his being deprived of his liberty for a longer time." 264 A.2d at 618. *See also* In re Gault, *supra*, 387 U.S. at 22–23 n. 30, 87 S.Ct. 1428.

11. The record reveals that Harvin is now serving his sentence at the Youth Corrections Center of Lorton Reformatory.

the agencies and institutions referred to are those mentioned in Section 5011. Moreover, under Section 5012 [12] these must be certified as "proper and adequate treatment facilities." Thus, the clause in Section 5011, "insofar as practical" prefacing the provision that "institutions and agencies shall be used only for treatment of committed youth offenders," coupled with the immediately following provisions, "and such youth offenders shall be segregated from other offenders," especially when read with Section 5012, precludes a penitentiary.[13] It is hardly to be supposed that a penitentiary is an institution or agency which "insofar as practical" shall be used only for treatment of committed youth offenders and is certified by the Director of the Bureau of Prisons for that purpose.[14]

Any doubt about this construction of the Youth Corrections Act is resolved by considering the Act in conjunction with 18 U.S.C. § 4083, which, as hereinabove set forth, limits confinement in a penitentiary to a person convicted of an offense punishable by imprisonment for more than one year, and its corollary provision which reads:

A sentence for an offense punishable by imprisonment for one year or less shall not be served in a penitentiary without the consent of the defendant.

I agree with Judge MacKinnon's conclusion that the imprisonment referred to in Section 4083 is the imprisonment which Congress specified as the punishment for the offense itself, independently of the Youth Corrections Act, here not to exceed the six months specified in D.C.Code § 22–3102. I also agree with his view that it would be quite unreasonable in light of the purposes of the Youth Corrections Act to construe it to permit imprisonment of a youth offender in a penitentiary while at the same time the Attorney General is prohibited by Section 4083 from confining in a penitentiary an adult sentenced to imprisonment for a year or less, unless by his consent such confinement is waived. Section 4083 and the Youth Corrections Act are related and should be construed in a manner to harmonize one with the other. _Cf._ Boys Markets, Inc. v. Retail Clerk's Union, 398 U.S. 235, 250, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).

We construe the provisions of the Youth Corrections Act to limit the place

12. This Section provides:

No youth offender shall be committed to the Attorney General under this chapter until the Director shall certify that proper and adequate treatment facilities and personnel have been provided.

If no such facilities and personnel are available, then the sentencing court could not sentence the youth offender under the Act.

13. The "insofar as practical" proviso, thus, can only mean that an agency or institution designed for Youth Corrections Act treatment may also be used, if necessary, for other purposes consistent with that function.

14. For a similar construction of the Attorney General's power over juveniles committed to the National Training School for Boys, under Section 4082, where the Congressional intent is much less clear, see White v. Reid, 125 F.Supp. 647 (D.C.C.1954), and Kautter v. Reid, 183 F.Supp. 352 (D.D.C.1960). In the

former, the late Judge Laws, Chief Judge of the United States District Court, who actively participated in the enactment of the Youth Corrections Act, was guided by the following considerations which are equally pertinent to this case:

It is true that in both juvenile court and criminal proceedings a person may be deprived of his liberty. * * * [But] there is a fundamental legal and practical difference in purpose and and technique. Unless the institution is one whose primary concern is the individual's moral and physical well-being, unless its facilities are intended for and adapted to guidance, care, education and training rather than punishment, unless its supervision is that of a guardian, not that of a prison guard or jailor, it seems clear a commitment to such institution is by reason of conviction of crime and cannot withstand an assault for violation of fundamental Constitutional safeguards.

125 F.Supp. at 650.

in which a sentence under it may be served to an institution where the confinement is consistent with the purposes of the Act to afford treatment and rehabilitation. The loss of liberty may not be by confinement of a character which constitutes infamous punishment. It follows that in no event may it be in a penitentiary. We cannot attribute to Congress an intent to the contrary. It is true that at times an unintended result follows from the terms of an enactment, but we do not think Harvin's case presents such an instance, for neither the character of the crime for which he was convicted, as evidenced by the sentence prescribed for it, nor the alternative sentence available in the discretion of the court under the Youth Corrections Act requires such a result.

It is said that a sentence under the Act nevertheless may turn out to result in confinement comparable to confinement in a penitentiary, and for this reason an indictment must precede the prosecution. Indeed, if the Act authorized such confinement it could be urged with reason that consistently with the Fifth Amendment a sentence under the Act could be imposed only after prosecution by an indictment, regardless of the minor character of the offense which furnished the occasion for the judge to resort to the Act. On the other hand, if such confinement is prohibited by the Act, this argument for an indictment is not available. For the reasons above set forth I conclude it is prohibited. Even when the conviction which gives rise to resort to the Act is a felony, and, therefore, the prosecution is by indictment, still a sentence under the Act may not validly be served in a penitentiary. So it is when the prosecution is by information. In neither case is the sentence

under the Act for a felony or an infamous crime. It is for the purposes envisaged by Congress, for which a penitentiary may not be utilized.

We are not concerned in this case with whether Congress as a matter of policy should require prosecution by an indictment as a condition to a sentence under the Act, or with questions of due process of law and the equal protection of the laws. Nor are we concerned with the remedy available to a youth offender if his confinement is inconsistent with this opinion, though we have no doubt that habeas corpus would be available in an appropriate case. The question simply is whether the Indictment Clause of the Fifth Amendment, applicable only to an infamous crime, precludes utilization of the Act following prosecution of a non-infamous offense by information.

A majority of the court hold that Harvin validly waived trial by jury and affirm the conviction. While for the reasons set forth in Part II of this opinion I disagree, I would not hold that because the prosecution was by information the sentence was invalid or that the trial court was without jurisdiction because of the sentence.

## II.

There remains the question whether appellant validly waived trial by jury. He urges that he did not, since the record does not disclose he was advised by the judge that if convicted he might be sentenced under the Youth Corrections Act, rather than as prescribed by Section 3102.[15] The question is whether a decision by an accused that the issue of his guilt should be submitted to a judge rather than to a jury may be significantly affected by the absence of ad-

---

15. As we have indicated appellant was acquitted of petit larceny. Being tried for that offense, however, he was entitled to a trial by jury under the Sixth Amendment; for "petty" larceny was a felony at common law and triable by jury. In re Fauldan, 20 D.C. (9 Mackey) 433 (1892). Moreover, as the penalty authorized for petit larceny by D.C.Code § 22–

2202 exceeds six months, the crime would not be considered "petty" under federal standards, 18 U.S.C. § 1; Duncan v. Louisiana, 391 U.S. 145, 161, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968); nor under the Sixth and Fourteenth Amendments, Baldwin v. New York, 399 U.S. 66, 90 S.Ct. 1886, 26 L.Ed.2d 437 (1970).

vice by the judge, or a showing on the record of awareness by the accused, that a sentence under the Act might be imposed.

In Dobkin v. District of Columbia, 194 A.2d 657 (D.C.App.1963), the District of Columbia Court of Appeals had before it a case in which the sentence had been increased as authorized by D.C.Code § 22–104 for a second offense. The trial had been by a judge of the Court of General Sessions without a jury. The Court of Appeals could not uphold the sentence because its enlargement brought the case within the class which conferred the right to trial by jury, and he had not been advised of this right. The court stated:

> If a defendant is to be subjected to the fifty percent greater penalty under § 22–104, he is entitled to notice of this prior to trial. * * * In this case the government gave no notice to appellant prior to trial that he might be subjected to the added penalties of § 22–104; consequently he could not have been subjected to them.

194 A.2d at 660.

While the question we have is whether appellant competently and intelligently waived trial by jury, not whether he was entitled so to be tried, Dobkin and appellant's case are on common ground in that neither the right to a jury in Dobkin nor the waiver of a jury in appellant's case are concerned with the issue of guilt but only with the sentence which might follow a conviction.

In Lawrence v. United States, 224 A.2d 306 (D.C.App.1966), the District of Columbia Court of Appeals affirmed Dobkin and went somewhat further in the direction of appellant's case. As appears from the opinion,

> [A]ppellant was entitled to and had originally asked for a jury trial, but later voluntarily withdrew this demand and chose to be tried by the court. At that time he had no knowledge he was to be sentenced under § 22–104 [as a second offender].

224 A.2d at 308.

The absence of timely notice that Section 22–104 would be invoked was held to preclude a penalty in excess of the maximum for a first offender. This decision, because it assumes that notice of the nature of the sentence available affects the decision whether to exercise the right to be tried by a jury, whereas in Dobkin the nature of the sentence establishes the right itself, goes beyond that case and becomes more pertinent to ours.

In its decision in appellant's case, however, the District of Columbia Court of Appeals avoided, I think unpersuasively, the implications of its Dobkin opinion and its decision in Lawrence, by holding that appellant's sentence under the Youth Corrections Act was not punishment, though of possibly longer duration than a sentence Section 3102 authorizes. A sentence under the Act not having the characteristics of punishment, its duration could be enlarged, the court held, notwithstanding appellant had not been so admonished when he waived his right to trial by jury. The court pointed out, however, that in fairness perhaps the better procedure would be for the court to inform a defendant he might be sentenced under the Youth Corrections Act, so that there could be no doubt he knowingly and intelligently waived his right to trial by jury.

I cannot accept the distinction drawn by the court between punishment and a sentence under the Act insofar as waiver of trial by jury is concerned. While it is true, as I have said in Part I of this opinion, that the Act does not lead to the kind of punishment or imprisonment which requires the prosecution to be on grand jury action, the enlarged duration of loss of liberty, similarly to an enlarged punishment as a second offender, is a factor of which the accused must be advised in deciding how to be tried. The length of punishment in one situation, and the length of deprivation of liberty in the other, are of like relevance in determining the advice the accused is entitled to have prior to waiving jury trial, even though the deprivation of liberty is

not punishment which makes the offense infamous.

In reaching the above conclusion I have in mind the fundamental place trial by jury as guaranteed by the Sixth Amendment has in our administration of criminal law. Decisions of the Supreme Court have establishd strict standards by which to determine the validity of a waiver of the right. *See* Johnson v. Zerbst, 304 U.S. 458, 464–465, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), with its reference to the requirement that waiver of constitutional rights must be "intelligent and competent." *And see* Illinois v. Allen, 397 U.S. 337, 343, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). It can hardly be so unless the accused knows the consequence of a finding of guilt. I am also fortified by the cases holding that a guilty plea does not meet the standards of Rule 11, *supra*, note 2, unless the accused is informed he might be sentenced under the Youth Corrections Act. *See, e. g.*, Kotz v. United States, *supra*; Freeman v. United States, 350 F.2d 940 (9th Cir. 1965); Chapin v. United States, 341 F.2d 900 (10th Cir. 1965); Pilkington v. United States, *supra; and see* our case of Carter v. United States, *supra*.[16] In these cases the absence of such advice did not affect the issue of guilt to any greater degree than in appellant's case. While the problem in the guilty plea cases was whether to plead guilty or to be tried, here it is how one chooses to be tried, also an important decision. If lack of knowledge of the availability of a sentence under the Youth Corrections Act invalidates the plea of guilty, it is difficult to see why it would not invalidate the waiver of trial by jury; for at the basis of the whole matter is the simple fact that the accused should be advised of those alternatives available to the sentencing judge which bear upon the decision the accused must make, whether it be to plead guilty or to waive the Sixth Amendment right to trial by jury.

In United States v. Straite, 138 U.S. App.D.C. 163, 425 F.2d 594 (1970), this court recently reviewed the developing law toward greater participation by the judge when an accused undertakes to waive jury trial.[17] The court refers to the tightening up of the applicable procedures in the Court of General Sessions, Jackson v. United States, 262 A.2d 106 (1970), to the views on the subject which have been expressed by the District of Columbia Court of Appeals, and to the recommendations of the American Bar Association Project on Minimum Standards for Criminal Justice (Trial by Jury, Part I, Section 1.2(b)), including the statement at p. 38 that "the better practice is for the court to advise the defendant of his right to jury trial before accepting a waiver," even if the accused has been informed by his counsel and has complied with Rule 23(a), Fed.R.Crim. P.[18] While in *Straite* we did not hold the waiver there "demonstrably involuntary," the court's discussion supports my conclusion that appellant's waiver was invalid; for aside from the absence of the advice by the court of his right to a jury trial recommended by the Bar Association Project, we have in appellant's case the absence also of advice by the court of the possibly extended sentence under the Youth Corrections Act.

---

16. To the contrary *see* Cunningham v. United States, *supra*.

17. In Harvin's case the record shows only the following:

 [COUNSEL FOR DEFENDANT:] Your Honor, we are going to withdraw the demand for jury trial, and take a trial by the Court.

 THE COURT: All right. On the charge of petit larceny and unlawful entry.

 Mr. Harvin, your attorney had indicated you wish to withdraw your desire for a jury trial, and will take a trial by the Court. Is that correct?

 MR. HARVIN: Yes Sir.

 THE COURT: All right, we will have a trial.

18. Rule 23(a), Fed.R.Crim.P., provides:

 Trial by Jury. Cases required to be tried by jury shall be so tried unless the defendant waives a jury trial in writing with the approval of the court and the consent of the government.

MacKINNON, Circuit Judge, with whom Chief Judge BAZELON, Senior Circuit Judge FAHY, and Circuit Judges McGOWAN, LEVENTHAL and SPOTTSWOOD W. ROBINSON, III, concur in Part I, and Circuit Judges McGOWAN, LEVENTHAL, ROBB and WILKEY concur in Part II: When appellant appeared before the Court of General Sessions on June 21, 1967 for sentencing he was 19 years old and a drug addict with a substantial criminal record. In 1962 he had been placed on probation for a purse-snatching robbery. Next his probation was extended because of an assault upon a paper boy. Subsequently he was committed to Cedar Knolls because of another assault. In 1964 he was arrested for housebreaking but the disposition of this charge does not appear. In 1965 for housebreaking in Maryland he received three years' probation and in 1966 he was twice convicted in the District of Columbia for petit larceny. He was on probation at the time of the instant offense.

Prior to appellant's sentencing the trial court invoked section 5010(e)[1] of the Youth Corrections Act and ordered him committed to the custody of the Attorney General for observation and study at a classification agency to obtain additional information concerning him, so as to determine whether he would derive benefit from the "treatment" authorized by the Youth Corrections Act. The agency made a report to the court, which it commented upon at the time of sentencing, as follows:

"THE COURT: Mr. Harvin, I would like, for the purpose of the record, to make observations. * * * You have been sent, by the Court, to the Federal Youth Corrections Act, to determine whether there is any way at all that the Court can deter you from a life of permanent crime.

"It is the opinion of the people in the Youth Correction Center, the Acting Supervisor, the Clinical Psychologist, that the only hope for you is that you receive individual psychotherapy under the Youth Center's controlled environment. It is the unanimous opinion, apparently, of the staff that the only alternative for you is to be sent to jail, which will not straighten out your problems; to send you to Lexington, which will only strengthen and not diminish your addiction problems or youth correction.

"As far as the Court is concerned, this is a classic case of what is in the best interest for you, or to be highly technical and say, 'Sure you can be out in six months', but to be released in six months is to be released on an inevitable life of crime.

"So, the Court finds that the defendant was 19 years of age on the date of conviction, and is suitable for handling under the Federal Youth Corrections Act. The defendant is hereby committed to the custody of the Attorney General and those authorized representatives for *treatment and supervision*, pursuant to 18 United States Code 5010(b), until discharged by the Federal Youth Correction Division of the Board of Parole, as provided by 18 U.S.C.A. 5017(c).[2]

"I might also note that the members of the Youth Correction Division of the Board of Parole that examined your file also feel that without the institutional training, there is no—that

---

1. "If the court desires additional information as to whether a youth offender will derive benefit from treatment under subsections (b) or (c) it may order that he be committed to the custody of the Attorney General for observation and study at an appropriate classification center or agency. Within sixty days from the date of the order, or such additional period as the court may grant, the Division shall report to the court its findings." 18 U.S.C. § 5010(e).

2. "A youth offender committed under section 5010(b) of this chapter shall be released conditionally under supervision on or before the expiration of four years from the date of his conviction and shall be discharged unconditionally on or before six years from the date of his conviction." 18 U.S.C. § 5017(c).

is the only way to possibly make a law abiding citizen out of you." (Emphasis added.)

The court thus sentenced Harvin under the Youth Corrections Act. The issues resulting from Harvin's sentencing are outlined in the opinion by Judge Fahy. These are twofold: First, whether Harvin's prosecution for the misdemeanor of unlawful entry under D.C.Code § 22–3102[3] must be initiated by indictment when a sentence is adjudged under the Youth Corrections Act; and secondly, whether appellant's conviction should be reversed because preceding his waiver of a jury trial he was not advised by the judge in open court that he could be sentenced as a youth offender under the Youth Corrections Act. My answer is to the negative on both questions which concurs with Judge Fahy on the first issue and with Judge Tamm on the second issue.

### I

Judge Fahy in Part I of his opinion concludes that it is not a violation of the Fifth Amendment to prosecute a youth offender for a *misdemeanor* where he is sentenced "to the custody of the Attorney General and those authorized representatives for treatment and supervision, pursuant to" the Youth Corrections Act (hereafter YCA) notwithstanding that the period of "treatment and supervision" for such offense may run six years as a maximum in extreme cases.[4] He bases this conclusion on an interpretation of the applicable statutes to the effect that a sentence under the YCA cannot be carried out by "infamous punishment." Judge Tamm dissents from this conclusion, contending the YCA sentences for misdemeanors may be carried out by infamous punishment because (1) the Attorney General allegedly may confine a youth offender committed under the YCA to a penitentiary for a misdemeanor, and (2) this may be for a period in excess of one year. If either of these contentions is invalid "infamous punishment" would not result from a YCA sentence for a misdemeanor. It is my conclusion that the first contention is invalid and thus my views concur with the result reached by Judge Fahy in Part I and with the reasons he assigns therefor.

In my view of the law neither the Attorney General nor any other United States official may cause any sentence for a misdemeanor adjudged with respect to any committed youth offender to be served in a penitentiary without the consent of the youth. This result seems obviously to be directed by the clear language of 18 U.S.C. § 4083 which provides:

> "Persons convicted of offenses against the United States or by courts-martial punishable by imprisonment for more than one year may be confined in any United States penitentiary.

> "A sentence for an offense punishable by imprisonment for one year or less shall *not* be served in a penitentiary without the consent of the defendant." (Emphasis supplied.)

This statute classifies prisoners into two groups: (1) those convicted of statutory felonies (imprisonment for more than one year) and (2) those convicted of statutory misdemeanors (imprisonment of one year or less). It then provides that those in the first group (felons) "may be confined in a United States penitentiary," and that those in the sec-

---

3. "Any person who, without lawful authority, shall enter, or attempt to enter, any public or private dwelling, building or other property, or part of such dwelling, building or other property, against the will of the lawful occupant or of the person lawfully in charge thereof, or being therein or thereon, without lawful authority to remain therein or thereon shall refuse to quit the same on the demand of the lawful occupant, or of the person lawfully in charge thereof, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceding $100 or imprisonment in the jail for not more than six months, or both, in the discretion of the court." D.C.Code § 22–3102.

4. *See* note 2, *supra*.

ond group may *not be required to serve any portion of their sentence "in a penitentiary" without their consent*. Under my interpretation of this statute, youth offenders convicted of misdemeanor violations are within the second group and since the requirement of consent assures that penitentiary confinement will not be enforced upon any offender so convicted, that is tantamount to determining that "infamous punishment" may not be imposed in any such case. My interpretation is based upon the legislative intent manifest in the relevant statute, as hereinafter outlined.

Because of its legislative history it is my opinion that the "sentence" referred to in the second sentence of section 4083 is the sentence of imprisonment authorized by the criminal statute prescribing the offense and not the sentence of "supervision and treatment" authorized under the YCA. Section 4083 is the result of a number of prior enactments which began in 1895 (28 Stat. 957), and culminated in the present statute. The terminology of the early acts[5] is not represented in the present statute, which began to acquire its present form in 1940. Section 7 of the Act of June 14, 1941, provided:

"Sec. 7. Hereafter all persons convicted of an offense against the United States shall be committed, for such terms of imprisonment as the court may direct, to the custody of the Attorney General of the United States or his authorized representative, who shall designate the places of confinement where the sentences of all such persons shall be served: *Provided, That any sentence of imprisonment for an offense punishable by imprisonment for a term of one year or less shall not be served in a penitentiary except with the defendant's consent*. The Attorney General may designate any available, suitable, and appropriate institutions, whether maintained by the Federal Government or otherwise, or whether within or without the judicial district in which the person was convicted. The Attorney General is also authorized to order the transfer of any person held under authority of any United States statute from one institution to another if in his judgment it shall be for the well-being of the prisoner or relieve overcrowded or unhealthful conditions in the institution where such prisoner is confined or for other reasons." 55 Stat. 252. (Emphasis added.)

And the Act on October 21, 1944 added the following to said Section 7:

"The authority conferred upon the Attorney General by this section shall extend to persons committed to the National Training School for Boys, by the juvenile court of the District of Columbia, as well as to those committed by any court of the United States." 55 Stat. 743–744.

In 1948 the 80th Congress "enacted into positive law" Title 18 of the United States Code entitled "Crimes and Criminal Procedure" which "revised and codified" the existing law. In so doing the prior law above quoted as section 7 was codified into Title 18 U.S.C. § 4083 to read as follows:

"Persons convicted of offenses against the United States or by courts-martial and sentenced to terms of imprisonment of more than one year may be confined in any United States penitentiary.

"A sentence for an offense punishable by imprisonment for one year or less shall not be served in a penitentiary without the consent of the defendant." Act of June 25, 1948, c. 645, § 4083, 62 Stat. 850.

It is well settled that such codification is not a new enactment, does not change the law and merely carries forward the same meaning as that contained in the

---

5. 28 Stat. 957; 29 Stat. 380.

prior law. A 1959 amendment to section 4083 produced the following result:

"§ 4083. Penitentiary imprisonment; consent.

Persons convicted of offenses against the United States or by courts-martial punishable by imprisonment for more than one year may be confined in any United States penitentiary.

"A sentence for an offense punishable by imprisonment for one year or less shall not be served in a penitentiary without the consent of the defendant." Act of September 14, 1959, Pub.Law 86–256, 73 Stat. 518.

The effect of this amendment was to alter the first sentence to substitute for the clause reading "and sentenced to terms of imprisonment of" the shorter clause reading "punishable by imprisonment for."

The purpose of this 1959 amendment was stated in the House Report which accompanied the bill to be as follows:

"Briefly, the first part of the present statute (which is sec. 4083 of title 18, United States Code) provides that persons sentenced to terms of imprisonment of more than 1 year may be confined in a U.S. penitentiary.

"The second part of that statute provides that a sentence for an offense punishable by imprisonment for 1 year or less shall not be served in a penitentiary without the consent of the defendant.

"It will be noted that the law is silent with respect to persons who may be convicted of a felony (that is, any offense punishable by imprisonment for more than 1 year) but who are sentenced to 1 year or less. The purpose of the instant bill is to close the gap by providing that persons convicted of an offense against the United States, or by courts-martial, punishable by imprisonment for more than 1 year, may be confined in any U.S. penitentiary." H.R.Rep.No.934, 86th Cong., 1st Sess., to accompany S. 1647, 2 U.S. Code Cong. & Ad.News, p. 2316 (1959).

From such legislative history emerged the present section 4083.

Turning then to the language of section 4083 as presently constituted, when all factors are considered, it is my conclusion that the clear import of the congressional intent indicates that when the statute refers to "offense[s] punishable by imprisonment," Congress intended to refer to the *punishment imposed by the criminal statute which defined the substantive offense* and not to the "treatment and supervision" authorized by the YCA. This conclusion is compelled by several indicia of congressional intent.

First, the basic provisions of section 4083 were enacted long before the YCA and thus never contemplated a YCA sentence.[6] There is thus no question that at its time of enactment the term "sentence" referred solely to the sentence prescribed by the criminal statute, and never contemplated the type of disposition now possible under the YCA, because such did not then exist.

Secondly, the YCA is pure additional legislation. It carries no repeal provision (64 Stat. 1086, *et seq.*). The absence of any repealer and the tenor of the entire Act indicates an intent to harmonize the provisions of the YCA with existing statutes and not to supplant them.

So construed, the entire statute (section 4083) manifests an intent to pro-

6. The Youth Corrections Act was enacted September 30, 1950 (64 Stat. 1085). The Juvenile Delinquency Act had preceded it by two years, being enacted June 25, 1948 (62 Stat. 857). Jurisdiction to proceed under the Juvenile Delinquency Act was based upon the "consent" of the juvenile (§ 5032) which was required to be in writing (§ 5033). Juvenile offenders could be sentenced to probation or to the custody of the Attorney General for terms not exceeding the juvenile's minority with the further proviso that the "commitment" shall not exceed the term which might have been imposed had he been tried and convicted of the alleged violation (§ 5034) (62 Stat. 858).

vide variable confinement, penitentiary and non-penitentiary, for two different categories of offenses, i. e., (1) those punishable by imprisonment for "more than one year," and (2) those punishable by imprisonment "for one year or less." The YCA, however, generally proceeds by a different standard. It has only one criterion and that is whether the youth offender has committed an offense that is "punishable by imprisonment." 18 U.S.C. § 5010(b) and (c). Thus, if the "treatment and supervision" authorized by the YCA were considered as the "sentence" by which section 4083 was to be applied every youth offender, so far as section 4083 is concerned, would be subject to penitentiary confinement. Under such circumstances the variable treatment for felons and misdemeanants intended by section 4083 when it was enacted would be completely wiped out for all youth offenders since all offenders sentenced under the YCA have a potential 6-year maximum period of treatment and supervision.[7] It is submitted that this would be an absurd result as it would attribute an intent to Congress to provide a harsher and more infamous form of punishment for youth offenders than that provided for adult violators of the same statute. However, everything in the YCA indicates an intent by Congress to provide milder and more understanding treatment and supervision and that broad considerate intent would not be furthered by construing the YCA so as to render completely nugatory the second sentence of section 4083 in all cases involving youth offenders who are sentenced under the YCA. To do so would produce the incongruous result that those youth offenders who are convicted of statutory misdemeanors and sentenced under the YCA would be imprisoned under the rules applicable to felons. And if it were held that those so sentenced under the YCA were to be confined under the rules applicable to felons, there would be no reason not to apply the same rule to all juvenile offenders committed to

any federal institution for a period of time that might exceed one year.

Additionally, since the Government is required to place all other criminal offenders in two categories insofar as penitentiary confinement is concerned, I see no administrative hardship or violence to legislative intent to conclude, as I do, that under § 4083 youth offenders sentenced for misdemeanors under the YCA are to receive the benefit of the same two classification categories for purposes of determining their eligibility for penitentiary punishment, and are not to be subjected to more onerous punishment in this respect, than adult violators of the same statutes. It is accordingly my view that no committed youth offender, sentenced for an offense punishable by the provisions of the Act defining the substantive crime to imprisonment for one year or less, may be confined in any penitentiary. And this is the absolute rule regardless of how desirable or necessary some person in an official position might consider it to be to confine a youth offender convicted of a misdemeanor in a penitentiary. In my view, such interpretation is entirely in keeping with the YCA and also applies section 4083 in the reasonable manner presumed to be intended in all congressional acts and so as to require the "proper and adequate treatment" implied by 18 U.S.C. § 5012.

Judge Tamm's opinion on this point suggests that the YCA was modeled on Chapter 305 of Title 18 United States Code (18 U.S.C. §§ 4081–4086 (1964)), constitutes a parallel and independent system for processing youth offenders, and thus would supercede other more general correctional and penal statutes. It may have been remodeled somewhat on chapter 305 and it may be parallel legislation but this is only true to the extent that it contains parallel provisions and it does not contain any parallel provision to § 4083 as is indicated by footnote 3 of Judge Tamm's opinion. Thus, there is no reason to conclude that the

7. See note 2, supra.

clear language of § 4083 prohibiting the imprisonment in a penitentiary without their consent of persons convicted of an offense punishable as a misdemeanor is not applicable to youth offenders sentenced under the YCA for misdemeanor offenses. There is nothing in the YCA that is inconsistent with the provisions of § 4083 and hence there is nothing upon which to base a conclusion that any provision of the YCA supplements or replaces § 4083 or is even parallel to it. And more particularly, § 5011,[8] which provides for the segregation of youth offenders for treatment, is completely consistent with the provisions of § 4083 prohibiting penitentiary confinement of any offender (youth or adult) convicted of a misdemeanor. In the absence of some conflict between the two statutes the provisions of both are to be given effect and a conflict is not to be generated by broad references to remote legislative history.

To hold that the guarantees of § 4083 against penitentiary confinement were applicable to adult offenders but inapplicable to youth offenders would be a discrimination contrary to the whole intent and purpose of the YCA. Actually, since we are dealing with a criminal statute it should be strictly construed in favor of the accused.[9] This rule of interpretation as applied to the statute would result in appellant's confinement being controlled by the restriction applicable to misdemeanors. And to the argument that the importation of such a limitation into a YCA sentence is "alien to its underlying philosophy," my conclusion is exactly to the contrary. I find

that a YCA sentence is completely in keeping with the beneficent purpose of that statute and that such interpretation would not cause any administrative hardship.

It is accordingly my conclusion that Congress never intended the YCA, or any other statute it enacted, to be construed so that adult misdemeanor offenders *could not* be confined in penitentiaries but youth offenders convicted of the same crimes *could* be so confined. To so hold would run counter to the entire warp and woof of all congressional legislation on the subject.

## II

However, I do not concur in Part II of Judge Fahy's opinion. On the point there discussed I fail to see any error in the manner in which appellant waived his right to a jury trial and no prejudice to him in the fact that the record does not disclose that his waiver of a jury trial was preceded by any statement by the trial judge that appellant, if convicted, might be sentenced under the YCA rather than to the imprisonment and fine authorized by D.C.Code § 22–3102,[10] which *defines* the crime of unlawful entry. He was always subject to being sentenced under the YCA whether he was tried by a jury or by the court. His waiving a jury trial did not alter in any respect the available sentence possibilities. However, it is of course desirable for the trial judge to advise a youth offender who is charged with a misdemeanor of the possibility of his being sentenced under the Youth Cor-

8. "Committed youth offenders not conditionally released shall undergo treatment in institutions of maximum security, medium security, or minimum security types, including training schools, hospitals, farms, forestry and other camps, and other agencies *that will provide the essential varieties of treatment.* The Director shall from time to time designate, set aside, and adapt institutions and agencies under the control of the Department of Justice *for treatment.* Insofar as practical, such institutions and agencies shall be used only for treatment

of committed youth offenders, and such *youth offenders shall be segregated from other offenders, and classes of committed youth offenders shall be segregated according to their needs for treatment.*" 18 U.S.C. § 5011 (emphasis supplied).

9. United States v. Cook, 384 U.S. 257, 262, 86 S.Ct. 1412, 16 L.Ed.2d 516 (1966); United States v. Bramblett, 348 U.S. 503, 509, 75 S.Ct. 504, 99 L.Ed. 594 (1955). *See* note 3, *supra.*

10. *See* note 3, *supra.*

rections Act. Such warning may promote understanding and avert litigation.

In my view it cannot be concluded that a jury trial was not properly waived from the fact that the record does not show the accused was informed in open court by the judge of a fact that would not be affected in any way by such waiver. Judge Fahy's opinion relies on cases under Rule 11, Fed.R.Crim.P.[11] which prescribes the procedure a judge must follow in accepting a plea of guilty. The Federal Rules of Criminal Procedure do not apply to criminal proceedings in the Court of General Sessions for the District of Columbia where this case was tried.[12] Such rules are being referred to here only because they were involved in several cases cited in Judge Fahy's opinion and because the Federal Rules are widely recognized as providing for acceptable procedures in criminal trials. The Federal Rule specifically states that the court should address the defendant before accepting a guilty plea. Rule 23, Fed.R.Crim.P.,[13] however, provides a different procedure for waiver of a jury trial. Such waiver must be (1) in writing, (2) with the approval of the court, and (3) with the consent of the Government. This procedure was followed by the trial court, but the opinion of Judge Fahy would in effect impose the same procedural requirements for waiver of a jury trial as are imposed by Rule 11 for entry of a plea of guilty. To me this is no more required for the Court of General Sessions than it would be for the United States District Court. The trial court fully complied with the

procedures prescribed by Rule 23(a) and in my view that is sufficient.

Appellant claims support for his argument on this point in the decision of the District of Columbia Court of Appeals in Dobkin v. District of Columbia, 194 A.2d 657 (D.C.App.1963). That decision held that the defendant was entitled to advance notice of an intention to prosecute him as a second offender where the additional punishment which became possible by virtue of adding the charge that he was a second offender created a right to a jury trial which had not existed before. Lawrence v. United States, 224 A.2d 306 (D.C.App.1966), and Brandon v. United States, 239 A.2d 159 (D.C.App. 1968), are also relied upon. These cases, like Dobkin, both deal with second offender charges in which the Government is required to give final notice of its intention to prosecute the accused as a second offender before he withdraws his demand for a jury trial.

These second offender cases, however, are distinguishable from situations arising under the Youth Corrections Act. In the second offender cases the accused is not placed on notice of the maximum punishment he faces when he is charged with an offense which is actually a second offense until it is additionally charged formally as a "second offense." Any youth offender, however, is always subject to the possibility that he will be sentenced under the YCA from the moment he is charged and the maximum punishment to which he is exposed cannot thereafter be enlarged in any way. However, under the YCA the maximum

11. "Pleas—A defendant may plea not guilty, guilty or, with the consent of the court, *nolo contendere*. The court may refuse to accept a plea of guilty, and shall not accept such plea or a plea of *nolo contendere* without first addressing the defendant personally and determining that the plea is made voluntarily with understanding of the nature of the charge and the consequences of the plea. If a defendant refuses to plead or if the court refuses to accept a plea of guilty or if a defendant corporation fails to appear, the court shall enter a plea of not guilty.

The court shall not enter a judgment upon a plea of guilty unless it is satisfied that there is a factual basis for the plea." Fed.R.Crim.P. 11.

12. *See* Fed.R.Crim.P. 1, 54(a) (1) and 54 (c).

13. "*Trial by Jury.* Cases required to be tried by jury shall be so tried unless the defendant waives a jury trial in writing with the approval of the court and the consent of the government." Fed.R.Crim. P. 23(a).

possible punishment remains the same at all times [14] and is in nowise altered by waiver of a jury trial.

Thus, since the procedure required of United States District Courts by Rule 23, Fed.R.Crim.P., for the waiver of a jury trial was followed, it is my view that such procedure fully protected all rights of the appellant, and that we should affirm the decision by the District of Columbia Court of Appeals in Harvin v. United States, 245 A.2d 307 (D.C.App.1968).

TAMM, Circuit Judge, with whom Circuit Judges ROBB and WILKEY concur, and Circuit Judge J. SKELLY WRIGHT concurs in Parts I–IV, concurring in part and dissenting in part:

I concur in Judge MacKinnon's conclusion that the appellant validly waived his right to a trial by jury. However, I cannot agree that either of the approaches suggested by Judge Fahy and Judge MacKinnon provides a statutory construction which will satisfactorily resolve appellant's challenge to the practice of imposing sentence under the Federal Youth Corrections Act when the defendant was prosecuted by information rather than indictment. Moreover, even if I could be persuaded to accept one of these interpretations of the governing statutes, I do not believe that this case can be decided without undertaking a careful re-examination of the meaning of the phrase "infamous punishment" contained in the Fifth Amendment to the Constitution, when this standard is applied to Youth Corrections Act treatment.

## I.

As I understand the positions taken by the other members of this panel, there is little doctrinal dispute concerning the content of the tests which the Supreme Court has traditionally applied in determining when the Fifth Amendment right to prosecution by indictment attaches. According to the cases cited in Judge Fahy's opinion, the first principle guiding analysis of the present question is that the determination of whether a crime is infamous should be made by reference to the punishment which *could* be imposed under the relevant statutory provisions, rather than by reference to the penalty actually given in a particular case. Two aspects of the maximum possible punishment are significant in determining whether the crime is infamous within the meaning of the Fifth Amendment: (1) the nature of the punitive activity itself may be inherently infamous, as, for example, in the case of hard labor or corporal punishment; and (2) if the punishment is not by its nature infamous, then the duration and locus of confinement must be examined. Historically, the standard for infamous crimes applied pursuant to this latter inquiry has been whether the offense is punishable by confinement in a jail or penitentiary for more than a year. Finally, the cases make it clear that these principles are to be applied pragmatically rather than mechanically, with realistic appreciation of the manner in which a particular form of punishment is presently viewed by the community; as the Supreme Court stated in the leading case of Ex parte Wilson, 114 U.S. 417, 427, 5 S.Ct. 935, 940, 29 L.Ed. 89 (1885), "What punishments shall be considered as infamous may be affected by the changes of public opinion from one age to another."

## II.

I have no doubt that the relevant sections of the Federal Youth Corrections

---

14. " 'Youth offender' means a person under the age of twenty-two years at the time of conviction." 18 U.S.C. § 5006(e).

"If the court shall find that a convicted person is a youth offender, and the offense is punishable by imprisonment under applicable provisions of law other than this subsection, the court may, in lieu of the penalty of imprisonment otherwise provided by law, sentence the youth offender to the custody of the Attorney General for treatment and supervision pursuant to this chapter until discharged by the Division as provided in section 5017(c) of this chapter." 18 U.S.C. § 5010(b). *See* notes 1 and 2, *supra*.

Act (FYCA) provide that a misdemeanant can be confined for as long as six years, and that by their clear language these provisions invest the Attorney General and the Director of the Bureau of Prisons with broad discretion to select the place of confinement—discretion which, on the face of the statute, does not exclude the possibility that a youth convicted of a misdemeanor and sentenced under the FYCA could be incarcerated in a penitentiary. By reference to some rather vague language in the legislative history and reliance on Congress' generally benevolent purpose in enacting the Federal Youth Corrections Act, I cannot conclude that the provisions of the FYCA governing place of confinement and transfer are in fact conditional, and that, at least with respect to misdemeanor offenders prosecuted by information, they do not encompass the possibility of infamous incarceration.

I cannot agree that this result falls within the proper ambit of statutory construction. As will be developed more fully below, I believe that Congress' emphasis on "treatment" rather than "punishment" in its consideration of the FYCA should serve as the starting point of our inquiry rather than the conclusion, and that it is a dangerous oversimplification to say that the legislative history merely demonstrates a Congressional purpose to provide "milder" or "less harsh" treatment for youthful offenders. Enactment of the FYCA was not motivated solely by a vague desire to be nice to wayward children; Congress was much more pragmatic than that. The primary theory behind the decision to treat young offenders differently was the belief that the behavior patterns of the young can be altered more easily, and that society should be protected by eradicating antisocial behavior before the offender's personality hardens. This much is clear from the legislative history as a whole, as well as from the definition of treatment contained in 18 U.S.C. § 5006(g) (1964).

In addition, there is a practical difficulty inherent in Judge Fahy's interpretation of the Act which arises primarily from the vagueness implicit in the term "treatment." From my reading of the majority opinion, it is not precisely clear to me what test is to be applied in determining what kind of FYCA confinement is mandated under the Fifth Amendment when the prosecution was initiated by information. At one point the opinion asserts that a sentence imposed under the FYCA must be carried out "in an institution where the confinement is consistent with the purpose of the Act to afford treatment and rehabilitation" and that the confinement must not be "of a character which constitutes infamous punishment." Since it is common knowledge that many correctional facilities which are "designed" to rehabilitate actually do quite the opposite, I interpret this language to mean that the institution in which a youth sentenced under the FYCA is confined must not only be *designed* for treatment and rehabilitation, it must *in fact* provide these benefits. If this is the test which Judge Fahy intends to enunciate, I believe he should state it explicitly because the Act itself offers scant guidance in determining what types of confinement are permissible under its provisions. Section 5006(g) merely states that " 'treatment' means corrective and preventive guidance and training designed to protect the public by correcting the antisocial tendencies of youth offenders." This language, I believe, could just as easily be employed to describe the purpose of admittedly infamous punishment such as penitentiary confinement; after all, virtually every institution in our correctional system offers at least lip service to the rehabilitative ideal. In defining the perimeters of a constitutional right, we should be scrupulous to avoid uncritical and unexplicated reliance upon a nebulous word like "treatment" which can be used too easily to mask a lack of knowledge as to how particular varieties of human behavior can be changed or improved, or to obscure the fact that insufficient resources for our correctional in-

stitutions often render the promise of therapy illusory.

This concern is of practical as well as theoretical significance because of earlier holdings which certainly suggest that youth offenders like appellant have a right to treatment and, presumably, a right to judicial relief if they are confined under conditions which are "infamous" or not sufficiently "rehabilitative." *Cf*. In re Gault, 387 U.S. 1, 22–23 n. 30, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); Creek v. Stone, 126 U.S.App. D.C. 329, 379 F.2d 106 (1967). If the legislative history of the Act provides a firm basis for distinguishing between FYCA treatment and the incidents of infamous punishment, then these factors ought to be set forth with precision and clarity; at least, I see no advantage in postponing consideration of this problem until future cases arise. Construing the FYCA in this fashion necessarily imposes on the courts the task of reviewing administrative decisions concerning the post-adjudicatory handling of youth offenders—an area in which the Supreme Court has been careful to avoid imposing restrictive rules in all of its cases concerning the rights of juvenile offenders, from *Gault* [1] through *Winship* [2]—and if this duty should be undertaken at all, it should be discharged in the manner which is least disruptive and burdensome for both the courts and the correctional officials.

### III.

Judge MacKinnon's approach seeks to avoid these difficulties by applying 18 U.S.C. § 4083 as an exception to the broad administrative discretion conferred by the FYCA. I do not believe that this interpretation comports with the purpose or design of the Federal Youth Corrections Act. Section 4083 is contained in Chapter 305 of Title 18 United States Code (18 U.S.C. §§ 4081–4086 (1964)), which deals generally with the commitment and transfer of federal prisoners, and which was in effect in substantially its present form at the time that the FYCA was promulgated. The close parallels between many provisions in Chapter 305 and the relevant sections in the FYCA, which are set forth in the margin,[3] strongly suggest that the Youth

[1.] In re Gault, 387 U.S. 1, 31 n. 48, 87 S.Ct. 1428, 1445, 18 L.Ed.2d 527 (1967) : "The problems of pre-adjudication treatment of juveniles, and of post-adjudication disposition, are unique to the juvenile process; hence what we hold in this opinion with regard to the procedural requirements at the adjudicatory stage has no necessary applicability to other steps of the juvenile process." *Cf*. Kent v. United States, 383 U.S. 541, 543, 86 S.Ct. 1045, 1048, 16 L. Ed.2d 84 (1966) : "Apart from raising questions as to the adequacy of custodial and treatment facilities and policies, some of which are not within judicial com-

petence, the case presents important challenges to the procedure of the police and Juvenile Court officials upon apprehension of a juvenile suspected of serious offenses."

[2.] In re Winship, 397 U.S. 358, 366, 90 S.Ct. 1068, 1074, 25 L.Ed.2d 368 (1970) : "[T]he opportunity during the post-adjudicatory or dispositional hearing for a wide-ranging review of the child's social history and for his individualized treatment will remain unimpaired [by adoption of the reasonable doubt standard]."

[3.]

| Chapter 305 | FYCA |
|---|---|
| § 4081. *Classification and treatment of prisoners.* | § 5011. *Treatment.* |
| The federal penal and correctional institutions shall be so planned * * * as to facilitate the development of an integrated system which will assure the proper classification and segregation of Federal prisoners according to the nature of the offenses committed, the character and mental condition of the prisoners, and such other factors as should be considered | * * * The Director shall from time to time designate, set aside, and adopt agencies * * * for treatment. Insofar as practical, such institutions and agencies shall be used only for treatment of committed youth offenders, and such offenders shall be segregated from other offenders, and classes of committed youth offenders shall be segregated according to their needs for treatment. |

Corrections Act was in large measure modeled upon Chapter 305, and that it was designed to constitute a parallel and independent system for the processing of youth offenders, supplanting the less refined provisions of Chapter 305. In addition, sections 5023 and 5026 of the FYCA contain indications that Congress

in providing an individualized system of discipline, care, and treatment * * *.

§ 5014. *Classification studies and reports.*

* * * Every committed youth offender shall first be sent to a classification center or agency. The classification center * * * shall make a complete study of each committed youth offender, including a mental and physical examination, to ascertain his personal traits, his capabilities, pertinent circumstances of his school, family life, any previous delinquency or criminal experience * * *.

\* \* \* \* \*

§ 4082.

(a) A person convicted of an offense against the United States shall be committed, for such term of imprisonment as the court may direct, to the custody of the Attorney General of the United States, who shall designate the place of confinement * * *.

(b) The Attorney General may designate as a place of confinement any available, suitable, and appropriate institution or facility * * * and may at any time transfer a person from one place of confinement to another.

§ 5010.

\* \* \*

(b) If the court shall find that the convicted person is a youth offender, and the offense is punishable by imprisonment * * *, the court may * * * sentence the youth offender to the custody of the Attorney General for treatment and supervision. * * *

§ 5015.

(a) On receipt of the report * * * from the classification agency the Director may—

\* \* \*

(2) * * * direct the transfer of the committed youth offender to an agency or institution for treatment; or

(3) order the committed youth offender confined and afforded treatment under such conditions as he believes best designed for the protection of the public.

(b) The Director may transfer at any time a committed youth offender from one agency or institution to any other agency or institution.

\* \* \* \* \*

§ 4083.

Persons convicted of offenses against the United States * * * punishable by imprisonment for more than one year may be confined in any United States penitentiary.

A sentence for an offense punishable by imprisonment for one year or less shall not be served in a penitentiary without the consent of the defendant.

[No precise analogue; § 5011, quoted in part above, is probably closest:]

Committed youth offenders not conditionally released shall undergo treatment in institutions of maximum security, medium security, or minimum security types, including training schools, * * * farms, forestry and other camps, and other agencies. * * * Insofar as practical, such institutions and agencies shall be used only for treatment of committed youth offenders * * * and classes of committed youth offenders shall be segregated according to their needs for treatment.

contemplated the possibility that the Act would supersede other, more general correctional and penal statutes, and incorporated saving clauses for those provisions which it desired to preserve unaffected. Thus, section 5023 of the Youth Corrections Act provides that "Nothing in this chapter shall be construed in any wise to amend, repeal, or affect the provisions of" the Federal Juvenile Delinquency Act, the Juvenile Court Act of the District of Columbia, or statutes relating to the court's power to impose probation in lieu of prison sentences. Section 5026, which was also enacted with the main body of the FYCA and amended two years later, is of similar effect: "Nothing in this chapter shall be construed as repealing or modifying the duties, power, or authority of the Board of Parole * * * with respect to the parole of United States prisoners * * * not held to be committed youth offenders or juvenile delinquents." In light of these factors, I do not believe that we should create or rely upon any presumption that section 4083 is applicable to youth offenders; indeed, as I read the legislative history of the Federal Youth Corrections Act, there appears to be a strong argument that section 4083 would in some respects conflict with the purpose and design of that legislation.

The fundamental premise of the Youth Corrections Act is that young offenders are more amenable to change and rehabilitation than older criminals; as the House Report on the Act proclaimed,

"[i]t is believed that by [this] provision the problem of crime will be met at its focal point, namely, before the traits of the habitual criminal are allowed to develop." H.R.Rep.No.2979, 81st Cong., 2d Sess. 1 (1950) U.S.Code Cong. Service, p. 3983. There were two primary reasons why the existing law made this goal difficult to attain. The first of these related to the irrelevance of the length of penalties imposed for various crimes to the treatment needs and prognosis of the particular youthful offender: many of the statutorily prescribed sentences were either so short that corrections officials lacked sufficient time to implement a realistic program of rehabilitation, or so long that the benefits of a treatment plan could be lost before the young offender regained his freedom.[4] Therefore, the drafters of the Act virtually eliminated reference to the specific crime as a determinant of the length of a youthful offender's sentence; the only reliance upon statutory penalties as a determinant of the duration of FYCA confinement is contained in section 5010(c) of the Act, which provides that confinement may be continued for as long as the sentence imposed for the particular crime "[i]f the court shall find that the youth offender may not be able to derive maximum benefit from treatment * * * prior to the expiration of six years from the date of conviction." The reasoning behind this rejection of distinctions based on the nature of the offense was summarized by Harrison

---

4. *See, e. g.,* Hearings on a Correctional System for Youth Offenders Before a Subcomm. of the Senate Comm. on the Judiciary, 81st Cong., 1st Sess. 27 (Testimony of James V. Bennett, Director, Bureau of Prisons):

From the hundreds of cases of this type which have come across my desk I have formed the conclusion that in the task of correcting the offender the crucial element is that of time. Attitudes, habits, interests, standards cannot be changed overnight. Training in work habits and skills requires time. Once the individual has received the maximum benefit from the institutional program, however, it is just as important that his release to the community be effected promptly. In the case of each person confined there comes a period when he has his best prospects of making good in the community. His release should occur at that time. If he is released earlier he will not be ready for the task of establishing himself; if later, he may have become bitter, unsure of himself. * * *

Rarely does a day go by in one of our institutions for younger offenders without a youth being received whose sentence is either far too long or far too short, if the institution is to carry out its objective of correctional treatment.

Tweed, then president of the American Law Institute:

> The conclusion of the institute 6 or 8 years ago and its opinion today is that the criminal law and its administration fail adequately to protect society and particularly to prevent the development of habitual offenders because it has a false and unattainable purpose, namely, to impose punishment to fit the crime without reference to the personality of the offender or to the factors which caused his offense.
>
> It concluded further that if the criminal law is to do a more effective job of protection, it must seek to rehabilitate and segregate indefinitely those who remain incorrigibly dangerous. This new purpose, I believe, will be accomplished through the instrumentality of the proposed legislation now before the Senate.

Hearings on a Correctional System for Youth Offenders Before a Subcomm. of the Senate Comm. on the Judiciary, 81st Cong., 1st Sess. 37 (1949); *see also id.* at 35–36 for a description of the substantial role played by the ALI in drafting the Act.

The passage quoted above also suggests the second major refinement which the Youth Corrections Act added to existing practice: the segregation of youth offenders on the basis of their potential for rehabilitation. The primary importance which Congress accorded segregation as a device for attaining the Act's objectives is evidenced by the strong language which the House Report used to criticize the existing method of handling *young offenders.*

> By herding youth with maturity, the novice with the sophisticate, the impressionable with the hardened, and by subjecting youth offenders to the evil influences of older criminals and their teaching of criminal techniques, without the inhibitions that come from normal contacts and counteracting prophylaxis, many of our penal institutions actively spread the infection of crime * * *.

H.R.Rep.No.2979, 81st Cong., 2d Sess. 2–3 (1950). Section 5011 of the Act implements this philosophy by providing that convicted youth offenders shall be confined in institutions with varying degrees of security measures, and that "[i]nsofar as practical, such institutions and agencies shall be used only for treatment of committed youth offenders, * * * *and classes of committed youth offenders shall be segregated according to their needs for treatment."* (Emphasis added.) Similarly, section 5015 invests the Director of the Bureau of Prisons with broad discretion to decide which facility is most appropriate for a youth offender, on the basis of his classification studies.

Accepting either the statutory construction urged by Judge Fahy, or the broader rule suggested by Judge MacKinnon,[5] could conflict with this statutory scheme in several situations. For example, a misdemeanant sentenced under the FYCA may be so immune to rehabilitation that no "treatment" short of the traditional prison regimen will be helpful to him; to place such an offender in a more lenient therapeutic or vocational program would only harm other youth offenders who could still be helped. *This possibility does not seem insubstantial* when it is remembered that youth offenders can be as old as 22 years at the time of conviction, and that misdemeanants who receive FYCA sentencing will probably have long criminal records, like the appellant in the present case. There *may also be instances in which the most* promising course of treatment is brief confinement in a penitentiary, followed

5. Under Judge MacKinnon's approach, the existence of an indictment is basically irrelevant: no misdemeanor offender could be confined in a federal penitentiary. However, under this rationale there would still appear to be a question as to what result should obtain when a misdemeanant is confined under the FYCA to an institution which is not avowedly a penitentiary, but which is claimed to possess the incidents of infamous confinement.

by an extended period of more relaxed custody. One witness related such an incident to Congress during the hearings on the Federal Youth Corrections Act:

> Here was a case that appeared to be pretty hopeless and they sent him to San Quentin anticipating that they would have to hold him for the maximum time.
>
> [W]hen the kid realized that they actually put him in San Quentin * * he was absolutely beaten. He took this for 2 or 3 months as if the world had fallen in on him. * * * The upshot of it was that he made such a good record that they transferred him to a forestry camp and in 2 years he was discharged.
>
> * * * * * *
>
> Senator Kilgore. * * * You first have to convince them in their own minds that they have done wrong. * * * [T]hey usually will not admit it and you have to convince them that they cannot get away with it and the best thing for them to do is to behave themselves.

Hearings on a Correctional System for Youth Offenders, *supra*, at 77–78.

These situations may well be statistically insignificant in relation to the administration of the Act as a whole, but I see no proper basis for determining or assuming this key fact in the context of the present case. If these concerns are valid, then adopting either of the approaches detailed in the other two opinions will create several unsatisfactory alternatives: misdemeanor offenders who fit within any of the above categories will either be returned to the streets, which will thwart the Act's avowed purpose of protecting society, or they will be retained in useless treatment programs where they may actively hinder the rehabilitation of others, or they will be segregated within treatment facilities under conditions of confinement that are "infamous" in every respect save the name applied by this court.[6] Therefore, I cannot agree that either interpretation can be adopted without risking some violence to the design and operation of the Federal Youth Corrections Act, or engaging in judicial legislation which is based upon an insufficient factual input.

## IV.

Even if I could be persuaded to accept either of the statutory constructions advanced by the other members of the panel, however, I would find it difficult to assume that all possible FYCA sentences in which the incidents of confinement are somewhat less harsh than jail or penitentiary are constitutionally less infamous than a year in a federal prison.[7]

6. Such segregated facilities could well be similar to the Joan Howard Pavilion at Saint Elizabeths Hospital, of which we recently said: "[T]here is reason to believe that confinement in John Howard * * * entails extraordinary deprivations of liberty and dignity which make it, in effect, more penitentiary than mental hospital, even if it also provides some treatment." Covington v. Harris, 136 U.S.App.D.C. 35, 40–41, 419 F.2d 617, 622–623 (1969).

7. The continued vitality of the "one year in jail or penitentiary" test may also be subject to some doubt, since the most recent Supreme Court case on point was decided nearly half a century ago. United States v. Moreland, 258 U.S. 433, 42 S.Ct. 368, 66 L.Ed. 700 (1922). There the Supreme Court affirmed a decision of this court directing dismissal of a complaint where prosecution had been initiated by information, and the maximum penalty for the offense was fine and confinement at labor in the District of Columbia workhouse for twelve months. The dissenting justices described the regimen in the workhouse in the following lyrical terms:

> It is an industrial farm of 1150 acres, bordering on the Occoquan River. On the farm, in healthful and attractive surroundings, are many small, well-equipped buildings, appropriate for the residence and occupation of the inmates. These are employed on the premises, partly in agricultural, partly in industrial, pursuits. * * * The work is such as is ordinarily performed under favorable conditions on farms, in factories, and in the mechanical trades; and it is not harder. The eight-hour workday prevails. There is a school, a library, and a hospital. And there is no

As noted in part I of this opinion, Ex parte Wilson, 114 U.S. 417, 427, 5 S.Ct. 935, 29 L.Ed. 89 (1885), together with Mackin v. United States, 117 U.S. 348, 351, 6 S.Ct. 777, 29 L.Ed. 909 (1886), indicates that the question of what constitutes an infamous punishment is an issue which is particularly appropriate for de novo examination, and I do not think that this task can properly be avoided in this case.

For the young misdemeanor offender, probably the most important aspect of Youth Corrections Act treatment is the fact that it results in much longer confinement than the punishment prescribed for the underlying offense. The significance of this additional loss of liberty was clearly perceived by the appellant in this case, if not by the members of this court, and it seems likely that Harvin spoke for the vast majority of his contemporaries when he urged the court in his allocution not to impose Youth Correction Act treatment:

THE COURT: Mr. Harvin, you are back before the Court for sentencing, after having had a 60-day examination at the Federal Youth Correction Center. * * *

Do you have anything to say before the Court sentences you?

MR. HARVIN: * * * I just hope that the Court takes into consideration that the crime I [have] been accused of is a misdemeanor, and therefore, if I was to get a Youth Correctional action [sic] * * * it could be six years, and I might wind up having to go three or four years, when the Court of General Sessions has a maximum of a year on the charge that I am charged with. So, therefore, I'd like you to give me time from the Court of General Sessions * * * which is no more than a year, I believe.

At some point, surely, the duration of confinement for criminal activity should compel the conclusion that it is an infamous punishment, even though the incidents of that incarceration are less onerous than the traditional jail or penitentiary regimen; and I am not convinced that a six year sentence for a misdemeanor, even though it bears the palliative label "for treatment and rehabiliation," does not invoke the constitutional guaranty.

Secondly, I find it difficult to share the majority's apparent assumption that, because the Federal Youth Corrections Act is premised upon the humanitarian goal of rehabilitation [8] and seeks to employ the techniques of modern behavioral science, FYCA treatment is therefore easily distinguishable, for purposes of the Fifth Amendment, from sentences imposed on adult offenders. This rationale seems prima facie suspect in the wake of the Supreme Court's decision in *Gault:*

It is of no constitutional consequence— and of limited practical meaning—that the institution to which [the youthful offender] is committed is called an Industrial School. The fact of the matter is that, however euphemistic the title, a "receiving home" or an "industrial school" for juveniles is an institution of confinement in which the child is incarcerated for a greater or lesser time. His world becomes "a

---

wall, cell, lock, or bar to restrain the inmates. Nor are they subjected to a distinctive dress such as marks offenders. * * * The dominant purpose of Occoquan is not punishment, but rehabilitation. The compulsory labor is in a larger sense compulsory education. 258 U.S. at 444–445, 42 S.Ct. at 372.

8. Ex parte Wilson, 114 U.S. 417, 426, 5 S.Ct. 935, 939–940, 29 L.Ed.2d 89 (1885), suggests that the Congressional purpose in enacting a particular law is largely irrelevant to the question of whether prosecution must be initiated by indictment:

The purpose of the amendment was to limit the powers of the legislature, as well as of the prosecuting officers, of the United States. * * * [T]he constitution protecting every one from being prosecuted, without the intervention of a grand jury, for any crime which is subject by law to an infamous punishment, no declaration of congress is needed to secure or competent to defeat the constitutional safeguard.

building with whitewashed walls, regimented routine and institutional hours * * *." Instead of mother and father and sisters and brothers and friends and classmates, 'his world is peopled by guards, custodians, state employees, and "delinquents" confined with him for anything from waywardness to rape and homicide.

In view of this, it would be extraordinary if our Constitution did not require the procedural regularity and the exercise of care implied in the phrase "due process."

In re Gault, 387 U.S. 1, 27–28, 87 S.Ct. 1428, 1443–1444, 18 L.Ed.2d 527 (1967). The reasons for this suspicion of "treatment" programs are rooted in recent experience which has demonstrated our repeated failures in dealing with youthful offenders: now it is widely acknowledged that insufficient resources frequently force rehabilitative facilities to become mere custodial institutions;[9] that "[e]ven when we profess rehabilitation and correction as objectives, we probably know that to all of us some of the time * * * punishment and ret-

ribution are factors";[10] and that change in the labels applied to the confinement often does little to mitigate the stigma which follows from it.[11] Moreover, even if the Act's promise of therapy were fully realized, there would appear to be a substantial question as to whether six years of confinement for intensive psychotherapy, which was clearly contemplated in Harvin's sentence,[12] is less of an incursion on personal freedom and dignity than a year in the penitentiary.

The Federal Youth Corrections Act is undeniably an enlightened piece of legislation, and a welcome aid in the difficult task of sentencing young offenders; however, the dangers of allowing the goal of rehabilitation to obscure the impact on the individual of the means used to attain it have been cogently summarized by a leading commentator in this area:

Measures which subject individuals to the substantial and involuntary deprivation of their liberty contain an inescapable punitive element, and this reality is not altered by the facts that the motivations that prompt incarceration

---

9. See, e. g., Bazelon, Racism, Classism, and the Juvenile Process, 53 Judicature 373, 376 (1970):

> Even the best counselors and treatment facilities fall short of helping every juvenile offender. * * * I can see little indication that the community is attempting even these first steps. * * * The report of the District of Columbia Crime Commission several years ago outlined in dismaying detail the lack of psychiatric and rehabilitative facilities for young offenders in the District, the gross overcrowding of existing facilities, and the unimaginative reliance of authorities upon restraint rather than treatment. Little, if anything, has been done to increase resources.

10. Burger, "No Man Is an Island," 56 A.B.A.J. 325, 326 (1970).

11. See In re Gault, 387 U.S. 1, 22–24, 87 S.Ct. 1428, 1441–1442, 18 L.Ed.2d 527 (1967):

> [W]e are told that one of the important benefits of the special juvenile court procedures is that they avoid classifying the juvenile as a "criminal." The juve-

nile offender is now classed as a "delinquent." * * * It is disconcerting, however, that this term has come to involve only slightly less stigma than the term "criminal" applied to adults. * * *

> Beyond this, it is frequently said that juveniles are protected by the process from disclosure of their deviational behavior. * * * This claim of secrecy, however, is more rhetoric than reality. See also In re Winship, 397 U.S. 358, 366, 90 S.Ct. 1068, 25 L.Ed.2d 368.

12. At appellant's sentencing, the trial court stated:

> It is the opinion of the people in the Youth Correction Center * * * that the only hope for you is that you receive individual psychotherapy under the Youth Center's controlled environment. It is the unanimous opinion, apparently, of the staff that the only alternative for you is to be sent to jail, which will not straighten out your problems; to send you to Lexington, which will only strengthen and not diminish your [narcotic] addiction problems[;] or youth correction.

are to provide therapy or otherwise contribute to the person's well-being or reform. As such, these measures must be closely scrutinized to insure that power is being applied consistently with those values of the community that justify interference with liberty for only the most clear and compelling reasons.

F. Allen, The Borderland of Criminal Justice 37 (1964). These were the kinds of considerations which led the court in United States v. Reef [13] to hold that it was a violation of the Fifth Amendment to impose sentence under the Youth Corrections Act when prosecution had not been initiated by indictment, and I think that we would do well to follow this teaching. I cannot believe that a benevolent purpose and social science rhetoric provide sufficient grounds for avoiding a constitutional mandate which acts as "a substantial safeguard against oppressive and arbitrary proceedings." Smith v. United States, 360 U.S. 1, 9, 79 S.Ct. 991, 997, 3 L.Ed.2d 1041 (1959).

The scholarly phraseology of the majority opinion is impressive; it fails, however, to overcome my apprehension of its constitutional shortcomings. Thus, in order to avoid these potential constitutional infirmities, and to obviate the risk of complicating or frustrating administration of our correctional institutions, I would hold that sentence can be imposed under the Youth Corrections Act only when prosecution was initiated by indictment. If it appeared that such a decision would cause severe dislocation of prosecutorial, judicial, or rehabilitative functions, retroactivity could be limited pursuant to our holding in Gaither v. United States, 134 U.S.App.D.C. 154, 174–178, 413 F.2d 1061, 1081–1085 (1969). Accordingly, I would reverse.

13. 268 F.Supp. 1015, 1017 (D.Colo.1967) : The delicate distinction between "imprisonment", and "confinement in a prison for treatment and supervision" would probably not be appreciated by the youth offender who is behind bars. The cold fact is that the defendant is subject to imprisonment for a period exceeding one year, and "[a]pplying the euphemism 'treatment' to the discipline during confinement does not alter the arithmetic, and is immaterial for present purposes." Pilkington v. United States, 315 F.2d 204, 208 (4th Cir. 1963).

*Cf.* Jones v. Cunningham, 371 U.S. 236, 242–243, 83 S.Ct. 373, 377, 9 L.Ed.2d 285 (1963) :
It is not relevant that conditions and restrictions [on parole] * * * may be desirable and important parts of the rehabilitative process; what matters is that they significantly restrain petitioner's liberty to do those things which in this country free men are entitled to do. Such restraints are enough to invoke the help of the Great Writ.