**UNITED STATES of America**

v.

**Walter HOWARD, Appellant.**

No. 23830.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 5, 1970.

Decided June 30, 1971.

As Amended July 20, 1971.

Mr. Alfred L. Scanlan, Washington, D. C., (appointed by this Court) for appellant.

Mr. John O'B. Clarke, Jr., Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee. Mr. Charles F. Flynn, Asst. U. S. Atty., also entered an appearance for appellee.

Before LEVENTHAL, MacKINNON and ROBB, Circuit Judges.

LEVENTHAL, Circuit Judge:

This is an appeal from a judgment entered on conviction of first-degree felony-murder, armed robbery, assault with a dangerous weapon, assault upon a police officer with a dangerous weapon, and carrying a dangerous weapon (22 D.C.Code §§ 2401, 3202, 502, 505(b), and 3204), sentencing appellant to life imprisonment on the felony-murder count, ten to thirty years for armed robbery, three to ten years for each of the assault counts, and one year on the weapons charge. Appellant, who was a juvenile at the time of these offenses, challenges the jurisdiction of the District Court, claiming that the Juvenile Court improperly waived jurisdiction over him.

## I. FACTUAL BACKGROUND AND WAIVER PROCEEDINGS IN JUVENILE COURT AND DISTRICT COURT

### The Offense

There is little dispute concerning the events which gave rise to appellant's prosecution. On May 7, 1968, four young men entered the Brinsfield Drug Store at 3939 South Capitol Street and proceeded to rob the owner and his employees. During the course of the robbery a policeman, Detective Daniel E. Keller, suddenly appeared on the scene. A man inside the store fired a shot at the Detective as he approached, and that man and appellant then forced Mr. Brinsfield to walk with them to the front of the store in an attempt to escape. As they began to flee, Mr. Sweitzer, an employee, struggled with the robber who had fired at Detective Keller, and in the course of the fight, Mr. Sweitzer was shot and fatally wounded. Appellant was later identified as the man who had fired the fatal shot.

### Appellant's Prior Juvenile Record

Appellant was born on July 8, 1950, and was first involved with the Juvenile Court on July 30, 1964, when he was charged with housebreaking. He was placed on probation for that offense on May 4, 1965, and remained on probation until March 15, 1967. During his probation, appellant was arrested for unauthorized use of a vehicle (September 22, 1965) and was fined $10. On November 29, 1967, appellant was again arrested, for driving without a permit.

The first complaint against appellant involving an offense like robbery charged that on March 19, 1968, he and two other men robbed a credit union at gunpoint, taking approximately $90 and some jewelry from an employee. The record shows that on March 25, 1968, appellant, again with two others, robbed a second credit union, this time taking about $40 in cash. On April 24, 1968, appellant's

mother filed a complaint with the Juvenile Court that he was habitually beyond her control, in that he left home without permission, would not return until late at night, and refused to explain his absences or activities while away from home. Appellant was placed in the Receiving Home on April 24, but absconded on April 29, eight days before the robbery involved here. After his arrest on May 7, two additional charges of armed robbery were placed against appellant, one having occurred on May 1, and the other on May 3.

*Waiver Hearing in Juvenile Court*

At the waiver hearing on July 1, 1968, counsel for appellant proposed several programs toward the objective of his rehabilitation. Mr. Edwin Bethia, a professional social worker affiliated with the Neighborhood Delinquent Youth Program, stated that he regarded appellant as an excellent candidate for the Youth Enterprise Program (W.H. 10). He based his conclusion on appellant's apparent leadership qualities and his desire for money.

Mr. Donald P. Bennett, the former Intake Officer of the Juvenile Court, testified. In his report of April 29, 1968, which was put in the record, Mr. Bennett had concluded that appellant "can be helped in a juvenile setting since we have not exhausted our services, and since respondent shows a promise of rehabilitation, it is my recommendation that he be committed to the Department of Welfare." (W.H. 16). However, in his testimony at the waiver hearing, given after appellant's escape from the Receiving Home and his latest armed robberies, Mr. Bennett recommended that jurisdiction over appellant be waived: "I think of him somewhat of a sort you cannot treat if he will not avail himself of treatment. There is a question of whether he will not leave if he is under less strict controls. Number two, on the basis of behavior patterns, I cannot really consider him a juvenile, but more of an adult." (W.H. 24.)

Dr. Barry A. Bukatman, a psychiatrist for the Offender Rehabilitation Project of the Legal Aid Agency, testified that appellant's chances for rehabilitation were "very, very good" because appellant had the capabilities to utilize group therapy, if his treatments were intensive, and in a group setting with boys of his own age, rather than an adult setting where he would be attracted to the "in group." (W.H. 33). In addition, Dr. Bukatman filed an evaluation report dated June 24, 1968, wherein he stated, "If [Walter Howard] is incarcerated and maintained solely in a punitive penal institution, it is quite likely that he will become more deeply involved in crime until he ultimately oversteps his abilities and either is incarcerated for life or killed. On the other hand, if Walter is placed in an institution or setting where his strengths and abilities can be fostered and encouraged, to the extent even that he is allowed to continue with his current plans (which are not unrealistic) of becoming a lawyer, he has the potential to become a useful and meaningful member of society."

Miss Donna Jane Knowles, a case worker for the Offender Rehabilitation Project, summarized the vocational and academic programs available at the juvenile facility at Laurel, Maryland for older, more hardened male delinquents, which had opened around May 15, 1968. The facility was designed for 150 occupants and was scheduled to be fully operable by September, 1968, with group and individual therapy programs conducted by three psychologists and a psychiatrist, as well as academic and vocational courses. Miss Knowles had visited Laurel and considered it a "secure" institution, even though seven juvenile residents had escaped since its opening. (Tr. 231.)

The Court subsequently heard testimony from appellant in his own behalf. On July 30, 1968, the Juvenile Court waived jurisdiction over appellant. Judge Ketcham stated in his opinion that appellant's "alleged involvement in these new, most serious offenses indicates that

rehabilitation within the presently available juvenile facilities is unlikely." [1]

As it happened, July 30, 1968, was also the day this Court decided Kent v. United States, 130 U.S.App.D.C. 343, 401 F.2d 408 (1968). Appellant's counsel moved on August 14 to reopen the waiver hearing based on his understanding of the *Kent* decision. On September 25, the Juvenile Court ordered the Legal Psychiatric Services to determine whether appellant was suitable for civil commitment on the *ground of mental illness*. The court stated that unless appellant "is *civilly committable* * * * the case is waived."

On November 12, 1968, the waiver hearing was resumed in Juvenile Court. The Court referred to the report of Dr. Charles E. Ruch, staff psychiatrist with the Legal Psychiatric Services of the District of Columbia Public Health Service, which stated that appellant showed no signs of mental illness. Judge Ketcham also stated that he had visited the new Laurel facility in late July, and that he had seen "no evidence" of the type of treatment and rehabilitation programs recommended by Dr. Bukatman. The court reaffirmed its original decision waiving appellant to the District Court.

*District Court Proceedings*

On October 20–23, 1969, the District Court heard evidence on appellant's motion to dismiss the indictment on the ground of improper waiver of Juvenile Court jurisdiction. Dr. Markwell, a clinical psychologist, testified for appellant. He had interviewed appellant at the request of the Offender Rehabilitation Project, and given him psychological

evaluation tests. He testified that appellant was a "borderline psychotic" (Tr. 22), requiring "some kind of group experience where he interacted with other persons about his own age and * * * in a therapeutic situation, * * * and some kind of vocational training. (Tr. 26).

Dr. Markwell's conclusion was disputed by two witnesses called by the Government. Dr. Albert E. Marland, a court-appointed psychiatrist, testified that appellant was not "psychotic in any way." (Tr. 36). He also disagreed with the conclusion of Dr. Eliot Blum, a psychologist at St. Elizabeths Hospital who had submitted a report to the Juvenile Court, that appellant was a sociopath. (Tr. 37–39). Dr. Marland reiterated that appellant showed no signs of any mental illness. (Tr. 38.)

Dr. Daniel A. Pugh, a psychiatrist at St. Elizabeths, also testified for the prosecution. He had been appellant's chief interviewer at St. Elizabeths and had participated in the staff conference of July 15, 1968, which concluded that appellant was "not suffering from a mental illness." (Tr. 54). He also stated that during appellant's hospitalization there was never any evidence "of any loss of contact with reality." (Tr. 56.) He did not believe that any essential behavior on appellant's part "can be attributed to any psychiatric illness because there is no evidence that there has been any illness in Mr. Howard's case."

Mr. Bennett, the Intake Officer of the Juvenile Court, also testiifed in the District Court. He reiterated his reasons for recommending waiver of juve-

---

1. In its statement of reasons supporting appellant's waiver, the Juvenile Court stated:

> Respondent has had repeated contact with the Juvenile Court during the past four years. Although his response to court services was initially promising, his alleged involvement in these new, most serious offenses indicates that rehabilitation within the presently available juvenile facilities is unlikely.
>
> Respondent is a highly sophisticated young man of 18 who is alleged to have committed several armed robberies. He absconded once from the Receiving Home. A Juvenile setting cannot offer Respondent the rehabilitative programs he needs nor the protection that the community requires. If Respondent is found to have committed the alleged felonies, the safety of the public will require that he be incarcerated in a secure institution for a protracted period while undergoing treatment.

nile jurisdiction, including his view that appellant was a "most sophisticated youngster apparently well trained and experienced in armed robbery and obtaining 'fast' money," and that appellant represented "a potential threat to the safety of the community." (Tr. 69–70.)

All of the Juvenile Court records were received into evidence by the District Court, and transcripts of the original and resumed waiver hearings were read into the record. The District Court upheld the Juvenile Court's waiver as "appropriate and proper" (Tr. 326), stating that appellant "was not suffering from any mental illness, and there is no present indication of any mental illness." (Tr. 327).

## II. VALIDITY OF JUVENILE COURT WAIVER

A. We begin by considering, and rejecting, the contention that appellant was a "sick juvenile" and therefore could not be waived to the District Court.

In our 1968 decision on remand in Kent v. United States, *supra,* the Juvenile Court had waived jurisdiction over Kent knowing that he needed mental treatment, and was civilly committable, on the ground that his "potential danger to himself and others" made the District Court a more appropriate forum for ordering treatment. This court held that the Juvenile Court Act forbids "waiver of a seriously ill juvenile." The court stated (130 U.S.App.D.C. at 347, 401 F.2d at 412):

> "[I]t is clear that society can be protected without departing from civilized standards for the prompt and adequate care of disturbed children. The juvenile court can institute civil commitment proceedings against the

youngster. If commitment ensues, he will be confined and treated until he is no longer dangerous due to mental illness. If not, the juvenile court will be free to follow its usual procedures.

"Since waiver was not necessary for the protection of society and not conducive to Kent's rehabilitation, its exercise in this case violated the social welfare philosophy of the Juvenile Court Act. Of course, this philosophy does not forbid all waivers. We only decide here that it does forbid waiver of a seriously ill juvenile."

█ In Kent there was a premise of civil commitment guaranteeing public safety during the period of treatment. Although there were contrary indications to some extent from two psychologists, we cannot say that the Juvenile Court erred in concluding that appellant was not subject to civil commitment.[2]

B. Appellant challenges the validity of his waiver on the ground that the Juvenile Court did not fully explore the possibilities for his rehabilitation as required by statute and by decisions of this court and the Supreme Court. The provisions of the Juvenile Court Act governing waiver provide that jurisdiction may be waived only after "full investigation."[3] Section 16–2316(1) of the D.C.Code in turn provides that the waiver statute "shall be liberally construed so that * * * each child coming under the court's jurisdiction * * * shall receive such care and guidance * * * as will serve his welfare and the best interests of the District."

The "full investigation" required prior to waiver "cannot be mere ritual."[4] The statutory mandate anticipates a thorough exploration of the possible dispositions, short of waiver, by which the welfare

2. Dr. Markwell, a clinical psychologist, testified on the basis of interviews and psychological tests that appellant was a "border line psychotic" and Dr. Blum, a psychologist at Saint Elizabeths, reported that appellant was a "sociopath." However, three psychiatrists, Dr. Marland, appointed by the court, and Dr. Pugh, of Saint Elizabeths and Dr. Ruch of Legal Psychiatric Services, concluded that appellant showed no signs of mental illness.

3. 11 D.C.Code § 1553.

4. Haziel v. United States, 131 U.S.App. D.C. 298, 303, 404 F.2d 1275, 1280 (1968).

of the juvenile and the interests of the District may be secured.[5] As this court stated in Haziel v. United States, 131 U.S.App.D.C. 298, 302, 404 F.2d 1275, 1279 (1968),

> Both counsel and the court have a vital role to play in this exploration. The child's advocate should search for a plan, or perhaps a range of plans, which may persuade the court that the welfare of the child and the safety of the community can be served without waiver. And the court itself cannot remain inert. It also has a duty to utilize its "facilities, personnel, and expertise for a proper determination of the waiver issue." [Citation omitted]

Furthermore, as the Supreme Court held in Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), the decision to waive jurisdiction must be accompanied by a "statement of the reasons or considerations therefor." The Court did not "read the statute as requiring that this statement must be formal or that it should necessarily include conventional findings of fact. But the statement should be sufficient to demonstrate that the statutory requirement of 'full investigation' has been met; and that the question has received the careful consideration of the Juvenile Court; and it must set forth the basis for the order with sufficient specificity to permit meaningful review." Id. at 561, 86 S.Ct. at 1057.

■ With due regard for the presumption in favor of treating juvenile defendants in a juvenile setting, and the grave consequences that may follow from waiver to the District Court, we nevertheless conclude that the Juvenile Court did not abuse its discretion in determining, after exhaustive inquiry, that appellant's "rehabilitation within the presently available juvenile facilities is unlikely." [6]

The Juvenile Court held extensive hearings on appellant's prospects for rehabilitation, as well as the facilities available to carry out a meaningful program. While appellant's chances for rehabilitation were viewed favorably by Dr. Bukatman and Mr. Bethia of the Neighborhood Delinquent Youth Program, Mr. Bennett, the Intake Officer, who once had the same view as these two witnesses, testified that appellant's escape from the receiving home rendered him an unlikely candidate for successful treatment. Notwithstanding the testimony of Miss Knowles regarding the new Laurel youth facility, the court acted within its permissible discretion when it concluded, following personal visits by the judge, that the Laurel facility lacked the programs necessary for appellant's rehabilitation and in addition could not guarantee security of confinement.

The court was also entitled to consider, as it did, that appellant had reached the age of 18 at the time of his waiver hearing, and would be subject to juvenile jurisdiction for less than three years. 11 D.C.Code § 1551. The court could reasonably conclude, on the basis of testimony and appellant's past record, that even assuming a juvenile like appellant could be rehabilitated if provided with rehabilitation programs over a longer period of time, the short span available to the Juvenile Court as to this appellant would be insufficient to ensure success in any rehabilitative endeavor. The court's statement of November 12, 1968, without disturbing the July 30 waiver order, concluded that appellant, if guilty, "would best be dealt with by a wider range of powers, longer term possibilities, and greater choice of facilities that are available to the United States District Court and the Attorney General." (Tr. 325.) We see no abuse of discretion in the Juvenile Court's conclusion, following its effort to explore the possibilities for treating appellant in a juvenile setting, that no meaningful results could be accomplished with the limited facilities available to it, and in the limited

---

5. Id. at 302, 404 F.2d at 1279.

6. In re Howard, Docket No. 68–1981–J.

time frame of the Juvenile Court's jurisdiction.[7]

## III. APPLICATION OF YOUTH CORRECTIONS ACT

We turn to the possibility that appellant, though unsuited for treatment in the juvenile setting, might nevertheless have been appropriately considered for a sentence under the Youth Corrections Act, 18 U.S.C. § 5005 et seq.

Such a disposition lies within the range of possibilities foreshadowed by the Juvenile Court itself, which concluded that appellant could "best be dealt with by a wider range of powers, longer term possibilities, and greater choice of facilities" available to the District Court. In view of that statement, and the decisive part which it and similar considerations obviously played in the waiver decision, the District Court was required to give full attention to the prospects of this waived juvenile for rehabilitation under the long-range programs of the YCA.

▮▮▮ The Government contends that appellant's conviction of first degree murder precludes any sentencing under the Youth Corrections Act. The Government argues that since 22 D.C.Code § 2404 provides that the penalty for first degree murder is death or life imprisonment, the sentencing judge has no discretion to impose any other sentence. We do not agree.

▮▮▮ The ordinary criminal law provisions of the Code which specify the punishment for a crime are fully operative in limiting the sentence a judge may lawfully impose as to an adult offender, with detention for felonies prescribed as imprisonment in a penitentiary. However, if the defendant qualifies under the Youth Corrections Act, 18 U.S.C. § 5010, then the judge is not subject to the punishment provisions generally prescribed for the crime, unless he has made a prior determination that he will not impose sentence under the Youth Corrections Act. United States v. Waters, 141 U.S.App.D.C. 289, 437 F.2d 722 (1970). While a sentence under the Youth Corrections Act usually provides for confinement shorter than that accorded adult offenders, it may provide for confinement for a term longer than that permissible for adult offenders under the general criminal law provisions of the Code; in either event the Youth Corrections Act sentence prescribes confinement in a rehabilitative setting, with other youths, and not imprisonment in a penitentiary where the defendant would be subject to the influence of hardened adult offenders. Harvin v. United States, 144 U.S.App.D.C. 199, 445 F.2d 675 (May 7, 1971) (En banc).

The Youth Corrections Act is applicable to youth offenders (i. e. under 22 years of age at the time of conviction) who commit an offense "punishable by imprisonment." 18 U.S.C. § 5010. This is applicable in terms where the jury by its unanimous verdict, concludes both that defendant is guilty of having committed murder in the first degree and shall be punished by life imprisonment. It is not the place of this court to carve an exception into the statute not written in its language. Our conclusion is the more clear when we see, on studying the subject, that in a closely related statute providing for liberalizing of ordinary sentencing provisions, Congress did write in an exception. We refer to 18 U.S.C. § 4209, dealing with "young adult offend-

---

7. The court's statement of reasons for waiver, contained in its report of July 30, 1968, does not expressly state the various programs and rehabilitative possibilities explored by the court. Although the requirement of such full statement was set forth in Haziel v. United States, *supra*, that requirement was prospective in application only. Since *Haziel* was decided in September, 1968, this requirement has

no bearing on the validity of the July, 1968, report. As for the reinstatement order of November, 1968, that followed a hearing whose only purpose was to determine appellant's suitability for civil commitment. We regard the July 30 date as controlling particularly in view of the care which this record reveals was accorded appellant by the Juvenile Court.

ers" (ages 22 through 25) which contains an express exception for offenses "for which there is provided a mandatory penalty." That exception plainly renders Section 4209 inapplicable to young adult offenders for an offense carrying a penalty that is "mandatory" for adult offenders, which covers the case of a verdict finding guilt of first degree murder and providing for life imprisonment. But neither the exception set forth in Section 4209 nor any other was written into Section 5010, which applies to all "youth offenders" who commit a crime "punishable by imprisonment." [8]

■ The same considerations also dispose of the Government's contention that Youth Corrections Act disposition is negatived by the statute providing that a person sentenced for first-degree murder shall not be eligible for parole until 20 years after he begins serving his sentence. That provision in 22 D.C.Code § 2404 is only applicable to a person convicted of first degree murder "upon whom a sentence of life imprisonment is imposed."

It is elementary that the jury verdict is not a sentence. The court's judgment sentencing a defendant under the Youth Corrections Act is not a parole from a sentence of life imprisonment. It is a sentence of confinement under special conditions. A youth offender found guilty of first degree murder has committed an offense "punishable" by life imprisonment, as we have noted, but when he has been sentenced under the Youth Corrections Act he is not one upon whom a sentence of life imprisonment has been imposd.

We are not free to disregard what the Youth Corrections Act provides in its language on the ground that it leads to absurd results. This can be dramatically illustrated by reference to the felony murder rule where first degree murder may be the result of, say, a robbery that

is planned but a homicide that is happenstance. A youth who plans and succeeds in a robbery is eligible for consideration under the Youth Corrections Act. Even though the crime is serious there may be rehabilitative potential in a young man, whose turn to crime may have reflected bad companions and example in an unfair slum rather than hardened depravity. United States v. Waters, *supra*. If by pure accident a death occurred in the course of the robbery the result in law is to make the offender guilty of first degree felony murder, yet so far as sentencing discretion is concerned, this accident might not reduce his potential for rehabilitation, and might indeed enhance it with remorse. This is for the sentencing judge to determine.

■ The record before us does not indicate whether the District Court considered the possibility of sentencing appellant under the Youth Corrections Act, or even whether the District Judge felt free to do so. We think the course generally prescribed for sentencing judges by United States v. Waters, *supra*, is applicable in the present case, though sentence was imposed prior to *Waters*, because the court was sentencing a juvenile who had been waived by the Juvenile Court for the purpose of obtaining a judgment with the broad flexibility and long supervision span available in a sentence imposed by the District Court. We therefore remand the record with instructions to the District Court to consider the possibility of sentencing under the Youth Corrections Act in accordance with the rule of United States v. Waters.

So ordered.

MacKINNON, Circuit Judge, concurring:

I concur in the foregoing opinion. The Youth Corrections Act (YCA) was enacted September 30, 1950 (64 Stat. 1086). As originally enacted it did not

---

8. When Congress amended 22 D.C.Code § 2404 in 1962 to permit life imprisonment, in lieu of what had formerly been a mandatory death penalty, Congress could, if it had so intended, excepted first degree murder from the coverage of the YCA. Pub.Law 85–752 § 4, 72 Stat. 846 (August 25, 1958).

apply to the District of Columbia (18 U.S.C. § 5024, 64 Stat. 1089). On April 8, 1952, Congress amended 18 U.S.C. § 5024 to apply the YCA "to youth offenders convicted in the District of Columbia of offenses under any law of the United States not applicable exclusively to such District. * * *" (66 Stat. 45). The effect of this 1952 amendment generally was to apply the YCA to those convicted of so-called federal offenses but to exclude youth offenders who violate the District of Columbia criminal code from the benefit of the YCA sentencing provisions. Congress took the final step on December 27, 1967 when it amended section 5024 to provide that the entire chapter (YCA) "shall apply in the States of the United States *and in the District of Columbia*" (emphasis added) (81 Stat. 741). This latter amendment eliminated the prior provision (66 Stat. 45) which had limited the application of the act in the District of Columbia to federal offenses. So the congressional intent is clear that it intended in 1967 to make the entire Youth Corrections Act applicable to all youth offenders of the criminal laws of both the District of Columbia and of the federal Government.

On the date the Youth Corrections Act was extended to youth offenders of the District criminal code, the code provided

with respect to first degree murder as follows:

The punishment of murder in the first degree shall be death by electrocution unless the jury by unanimous vote recommends life imprisonment; or if the jury, having determined by unanimous vote the guilt of the defendant as charged, is unable to agree as to punishment it shall inform the court and *the court shall thereupon have jurisdiction to impose and shall impose either a sentence of death by electrocution or life imprisonment.*

Notwithstanding any other provision of law, a person convicted of first degree murder and upon whom a sentence of life imprisonment is imposed shall be eligible for parole only after the expiration of twenty years from the date he commences to serve his sentence.

D.C.Code § 22–2404 (1967) (March 22, 1962, 76 Stat. 46). (Emphasis added).

As to the availability of a Youth Corrections Act sentence, for a youth offender convicted of first degree murder in the District of Columbia, 18 U.S.C. § 5010(b) authorizes a sentence under the Youth Corrections Act where the "offense is punishable by imprisonment under applicable provisions of law other than this subsection. * * *"[1] As previously noted, this Act applies to the District of Columbia (18 U.S.C. § 5024).[2]

1. 18 U.S.C. § 5010 in part provides:
   (b) If the court shall find that a convicted person is a youth offender, and the offense is punishable by imprisonment under applicable provisions of law other than this subsection, the court may, in lieu of the penalty of imprisonment otherwise provided by law, sentence the youth offender to the custody of the Attorney General for treatment and supervision pursuant to this chapter until discharged by the Division as provided in section 5017(c) of this chapter; or
   (c) If the court shall find that the youth offender may not be able to derive maximum benefit from treatment by the Division prior to the expiration of six years from the date of conviction it may, in lieu of the penalty of im-

prisonment otherwise provided by· law, sentence the youth offender to the custody of the Attorney General for treatment and supervision pursuant to this chapter for any further period that may be authorized by law for the offense or offenses of which he stands convicted or until discharged by the Division as provided in section 5017(d) of this chapter.
   (d) If the court shall find the youth offender will not derive benefit from treatment under subsection (b) or (c), then the court may sentence the youth offender under any other applicable penalty provision.

2. 18 U.S.C. § 5024 provides:
   This chapter shall apply in the States of the United States and in the District of Columbia.

The statute of the District of Columbia prescribing the offense of which appellant was convicted, in effect, imposes, and thereby authorizes, punishment of life *imprisonment* upon conviction of murder in the first degree where the jury, as here is unable to agree as to punishment.[3] Such provision for punishment satisfies the strict requirement of 18 U.S.C. § 5010(b) for an "offense * * punishable by imprisonment." The fact that life imprisonment is mandatory does not make it any the less "imprisonment."

It is argued that the statute authorizing Youth Corrections Act sentencing of youth offenders is "inconsistent" with the statute calling for mandatory life imprisonment as punishment for first degree murder. To the extent that the statutes conflict their inconsistency should be resolved in favor of lenity.[4] I am also satisfied that this was the intent of Congress. When Congress desired to exclude young adult offenders who were convicted of offenses for which the statute provides a mandatory penalty from the more liberal sentencing provisions of the Youth Corrections Act, it provided: "This Act does not apply to any offense for which there is provided a mandatory penalty." (18 U.S.C. § 4209, Sec. 7 of Pub.L. 85–752, 72 Stat. 846). This indicates that Congress was thoroughly familiar with the fact that some offenses called for mandatory penalties and with the means for excluding youth offenders convicted of offenses carrying mandatory penalties from the Youth Corrections Act. Its failure to create the same exclusion for youth offenders that it created for young adult offenders is indicative of an intent to have the Youth Corrections Act apply.

Another more recent instance when Congress spoke in a similar way occurred in the District of Columbia Court Reform and Criminal Procedure Act of 1970 (P.L. 91–358, July 29, 1970, 84 Stat. 473). In that enactment Congress provided that any person who commits a crime of violence when armed may for the first conviction be sentenced to a period of imprisonment which may be up to life imprisonment but if he is convicted more than once of having so committed a crime of violence when armed that he shall be sentenced to a minimum period of imprisonment of not less than five years and a maximum period of imprisonment which may not be less than three times the minimum sentence imposed and which may be up to life imprisonment (D.C.Code § 22–3203). In dealing with this situation Congress spoke clearly with respect to the application of the Youth Corrections Act and provided that it "shall not apply with respect to any person sentenced under section 2 of subsection (a) [the second offense provision]." D.C.Code § 22–3202 (d) (1). By this provision Congress made YCA sentencing available to a youth offender on his first conviction of a crime of violence when armed but excluded all youth offenders convicted of their second such crime. A crime of vi-

---

3. D.C.Code § 22–2404 (1967) in part provides:

    The punishment of murder in the first degree shall be death by electrocution unless the jury by unanimous vote recommends life imprisonment; or if the jury, having determined by unanimous vote the guilt of the defendant as charged, is unable to agree as to punishment it shall inform the court and the court shall thereupon have jurisdiction to impose and shall impose either a sentence of death by electrocution or life imprisonment.

4. *See* Ladner v. United States, 358 U.S. 169, 178, 79 S.Ct. 209, 214, 3 L.Ed.2d

199 (1958) ("[The] policy of lenity means that the Court will not interpret a federal criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended."); Bell v. United States, 349 U.S. 81, 83, 75 S.Ct. 620, 99 L.Ed. 905 (1955) ("When Congress leaves to the Judiciary the task of importing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity."); *cf.* United States v. Lewis, 140 U.S.App.D.C. 345, 347–348, 435 F. 2d 417, 419–420 (1970); Irby v. United States, 129 U.S.App.D.C. 17, 390 F.2d 432 (1967).

olence is defined by D.C.Code § 22–3201 to include the crime of "murder" so the statutes constitute a clear indication that Congress did not intend by this provision to exclude youth offenders convicted of murder from the provisions of the Youth Corrections Act where the murder conviction constituted their first conviction for a crime of violence while armed. Having so spoken specifically to not prohibit (and thereby permit) the application of the YCA to one convicted of murder as a first crime of violence while armed, it is completely consistent with the legislative intent so expressed to conclude that Congress intended to reach the same result in 1967 when it extended the YCA to the District of Columbia. Hence, it is my conclusion that the YCA is operative to confer authority upon the court to sentence Howard under the Youth Corrections Act if it finds him to be a proper subject for such sentencing.

The provision of the D.C.Code requiring twenty years' imprisonment for first degree murder in order to be eligible for parole does not derogate from the foregoing interpretation because such provision is only applicable to a "person convicted of first degree murder * * * *upon whom a sentence of life imprisonment is imposed * * * *.";[5] and if a Youth Corrections Act sentence were imposed the sentence need not be one to life imprisonment, though life imprisonment might be adjudged under the YCA. Section 5010(d) of the Youth Corrections Act does authorize the court, in sentencing a youth offender, to impose a sentence of life imprisonment where such sentence is one of the "other applicable penalty provision[s]"[6] of the statute he was convicted of violating.

I indicate no opinion as to what sentence should be adjudged.

ROBB, Circuit Judge, dissenting in part:

The waiver of jurisdiction by the juvenile court was so obviously correct that extended discussion of that matter is unnecessary; but I cannot agree that a defendant convicted of first degree murder in the District of Columbia may be sentenced under the Youth Corrections Act.

The provisions of the Youth Corrections Act, 18 U.S.C. §§ 5010 and 5017, enacted in 1950, are inconsistent with the provisions of D.C.Code § 22–2404, enacted in 1962. The District of Columbia statute provides that the punishment of murder in the first degree shall be death unless the jury by unanimous vote recommends life imprisonment. If the jury having found a defendant guilty of first degree murder is unable to agree as to punishment, the statute directs that the court "*shall* impose either a sentence of death by electrocution or life imprisonment" (emphasis supplied). The statute then provides that: "*Notwithstanding any other provision of law*, a person convicted of first degree murder and upon whom a sentence of life imprisonment is imposed shall be eligible for parole only after the expiration of twenty years from the date he commences to serve his sentence" (emphasis supplied). The Youth Corrections Act on the other hand authorizes the court, among other things, to suspend the imposition of sentence and place a youth offender on probation. Furthermore, the Act (18 U.S.C. § 5017 (a) and (b)) authorizes the Youth Correction Division at any time to release a committed youth offender conditionally under supervision, and to discharge him unconditionally at the expiration of one year from the date of conditional release.

I cannot believe that Congress ever intended or contemplated that a person con-

5. D.C.Code § 22–2404 (1967) in part provides:
    Notwithstanding any other provision of law, a person convicted of first degree murder and upon whom a sentence of life imprisonment is imposed

shall be eligible for parole only after the expiration of twenty years from the date he commences to serve his sentence.

6. 18 U.S.C. § 5010(d). *See* note 1 *supra*.

victed of first degree murder in the District of Columbia might be placed on probation or discharged unconditionally after serving only a year or so of his sentence. As I read the District of Columbia statute it explicitly directs the court, depending on the action of the jury, to impose one of two sentences—either death or life imprisonment, without parole for twenty years. I think the meaning and intent of Congress are plain and that the specific District of Columbia statute must prevail over the earlier and general provisions of the Youth Corrections Act.

The appellant notes that in section 4 of P.L. 85–752, Act of August 25, 1956, 72 Stat. 845, 846, 18 U.S.C. § 4209, Congress provided that the Youth Corrections Act applied to young adult offenders between the ages of 22 and 26, but also provided in section 7 of P.L. 85–752 that it did not apply to any offense for which there was a mandatory penalty. *See* 18 U.S.C. § 4209 ff. The appellant argues that the failure of Congress to include a similar exception in the statute relating to youth offenders indicates that Congress intended the Youth Corrections Act to apply to all youth offenders, including those convicted of first degree murder in the District of Columbia. The argument does not withstand analysis.

In the first place, the provisions of section 4, P.L. 85–752, relating to young adult offenders, did not apply to a person convicted under any law applicable exclusively to the District of Columbia (*See* P.L. 85–752, § 6). The District of Columbia first degree murder statute was applicable exclusively to the District of Columbia. Moreover, when the Youth Corrections Act was passed in 1950 and when P.L. 85–752 was passed in 1958 the only penalty for first degree murder in the District of Columbia was death.

Since the Youth Corrections Act applied only to offenses punishable by imprisonment, the offense of first degree murder in the District of Columbia, punishable by death, was not within its scope, or relevant to the amendment embodied in P.L. 85–752. Certainly it cannot be said that when it enacted P.L. 85–752 Congress was concerned with the effect of that statute upon the mandatory penalty for first degree murder in the District of Columbia.[1]

I would affirm the judgment of the district court.

---

1. It should be noted also that P.L. 85–752 did not deal only with young adult offenders; on the contrary it dealt broadly with methods of sentencing in the federal courts, providing, among other things, that the federal courts might impose indeterminate sentences. The exception, that the Act did not apply to any offense for which there was provided a mandatory penalty, was not aimed at young adult offenders alone, but related to the entire sentencing scheme provided for the federal courts. These circumstances I think are further indications that Congress was not focusing on youth offenders in the District of Columbia when it did not include them in the exception.