**GOVERNMENT OF THE VIRGIN ISLANDS, Plaintiff**

v.

**LUIS MARCIAL SANTANA, Defendant**

Crim. No. 60-1972

**GOVERNMENT OF THE VIRGIN ISLANDS, Plaintiff**

v.

**EUGENE MARTIN, JR., Defendant**

Crim. No. 85-1972

District Court of the Virgin Islands

Division of St. Croix

September 11, 1972

YOUNG, *Judge*

### MEMORANDUM OPINION SUR MOTIONS TO DISMISS INFORMATIONS

This opinion considers two motions to dismiss Informations against juveniles who have been committed to this court for trial as adults. In each separate case, the defendant alleges that the Juvenile Court failed to follow the proper procedures, or to apply the proper criteria, when deciding to waive its own jurisdiction over him. Although the cases were not consolidated in argument,

my decisions will be the same and this opinion is equally applicable to both. Both motions will be denied.

■ Briefly stated, I hold that the parens patriae aims of juvenile treatment will yield to considerations of public safety when it appears that a non-criminal rehabilitative program cannot be pursued without undue risk that the juvenile will either engage in further unlawful activity in the interim, or that he will be discharged by the termination of juvenile jurisdiction at the age of twenty-one before rehabilitation is complete.

The history of these cases, and their paths to this court, may be briefly stated. The first defendant, Luis Marcial Santana, was apprehended by the police on February 23, 1972, and charged under 19 V.I.C. § 631(a) with the sale of heroin. The complaint was filed in the Juvenile Court for the reason that the defendant was sixteen years of age at the time of the alleged offense. Six days later the Government petitioned to have the case transferred to the District Court. A hearing on the transfer was held April 21, and the Juvenile Court waived jurisdiction over the defendant three days afterwards.

The second defendant, Eugene Martin, Jr., was charged with burglary in the third degree under 14 V.I.C. § 444. Martin was also then aged sixteen. He had previously accumulated a lengthy record of criminal offenses of a larcenous nature, and at the time of the present arrest was an escapee from the Insular Training School. In view of his history of escape and recidivism, the Government moved to transfer the case to this court, and the motion was granted on June 15, 1972.

■■ Public policy can legitimately permit such waivers of jurisdiction. Normally the Juvenile Court exercises jurisdiction over all offenses committed by persons under the age of eighteen years. This permits rehabilitative and

non-criminal treatment of young persons, free of publicity and the damaging consequences of a permanent and perhaps premature criminal record. As has been said of a similar statute, "[i]t is implicit in [this] scheme that non-criminal treatment is to be the rule—and the adult criminal treatment, the exception which must be governed by the particular factors of individual cases." Kent v. United States, 383 U.S. 541, 560–61 (1966), quoting with approval Harling v. United States, 295 F.2d 161, 164–65 (D.C. Cir. 1961). It is nonetheless recognized that some juveniles are exceptionally mature and hardened, and that it would benefit neither them nor society at large to limit corrective measures to those contemplated for the average child. 4 V.I.C. § 176 therefore provides as follows:

"If a child 16 years of age or older is charged with an offense which would be a felony if committed by a person 18 years of age or older, and if the juvenile and domestic relations division of the Municipal Court after full investigation deems it contrary to the best interest of the child or of the public to retain jurisdiction, it may commit the child for proper criminal proceedings to the District Court; but no child under 16 years of age shall be so committed."

Both defendants claim that this language is inapplicable to them and have therefore moved that their cases be returned to the Juvenile Court. Although numerous grounds are assigned for these motions they may be categorized as of two types. First, the defendants urge that the Juvenile Court proceedings did not amount to the "full investigation" demanded by statute in that the Court did not consider the full range of relevant factors, including more particularly their need for rehabilitative treatment and the prognosis for their improvement thereunder. Secondly, they allege that the Juvenile Court waived jurisdiction solely because, by law, it could impose punishment only until the defendant reached the age of twenty-one;

159

that the court felt that this would be, if a conviction resulted, incommensurate with the seriousness of his offense; and that this, alone, is an impermissible ground for remitting a juvenile to adult proceedings. I believe both these grounds to lack merit.

## I. CONSTITUTIONAL CLAIMS

■ We are referred first to Kent v. United States, 383 U.S. 541 (1966), for the proposition that Juvenile Court jurisdiction may be waived only after a "full investigation" which includes inquiry into the rehabilitative needs of the defendant. It is clear, however, that the decision will not support a claim for a constitutional right to consideration of this particular factor. Rehabilitative needs were discussed in Kent because the District of Columbia Juvenile Court found their consideration mandated by its interpretation of its own governing statute. That court's analysis of the component factors to a "full investigation" was reproduced as an Appendix to the Supreme Court's opinion. The Supreme Court itself, however, made no comment indicating that this was a necessary substantive interpretation of the statutory phrase. Rather, it was concerned with the procedural requirements of due process applicable to a waiver hearing.[1] The Court recognized that waiver was a "critically important" decision to the juvenile, id. at 566, since if this step were taken he would become subject to greater punishments and a permanent criminal record. He is therefore entitled to correspondingly stringent safeguards, which include the rights to a hearing, the assistance of counsel, and to cross-examination of adverse witnesses.

---

[1] The procedural requirements were nominally based upon construction of the District of Columbia statute, but this construction was informed by the mandates of due process and the effective assistance of counsel. See, id. at 556. The constitutional basis of Kent was subsequently clarified by In re Gault, 387 U.S: 1 (1967).

■■ Among these procedural rights is one to a statement of the Juvenile Court's reasons for waiver; but this right does not reach a specific focus at rehabilitative considerations. As the Supreme Court noted, id. at 561:

"It is incumbent upon the Juvenile Court to accompany its waiver order with a statement of the reasons or considerations therefor . . . sufficient to demonstrate that the statutory requirement of "full investigation" has been met; and that the question has received the careful consideration of the Juvenile Court; and it must set forth the basis for the order with sufficient particularity to permit meaningful review."

■ While this language certainly requires that some relevant reason be given, it is evidently to guard against arbitrary or capricious action by the Juvenile Court. The very generality of the language makes clear that no particular finding is a constitutional precondition to waiver. Cases concerned with identifying specific criteria are based upon construction of the local statutes instead, and it is to those issues that we now turn.

## II. STATUTORY CONSTRUCTION

■ Each of the nation's Juvenile Court Acts is a creation of its own jurisdiction, extending or revoking the privilege of special treatment for young offenders in accordance with criteria reflecting the state's legislative judgment of social needs and sound penological policy. On the other hand, the many sociological studies undertaken in this field have contributed to a certain uniformity of policy, in at least its broad outlines, among the jurisdictions. In reliance on these accepted truths the defendants urge that their rehabilitative needs must be considered, and that a juvenile should not be committed to an adult court solely because a longer prison sentence is deemed appropriate to the offense as distinct from the offender. We agree with both of these contentions but find

them wide of the mark. The Juvenile Court Act in this jurisdiction has two touchstones: the needs of the offender, and the continued safety of the public. Every effort will be made to harmonize the two so that both ends may be served, but the public safety will have priority if it appears that it would be jeopardized by an attempt to care for a particular individual with the means and facilities provided for juveniles. Thus, while a consideration of rehabilitative potentialities is implicit in the above analysis, the Juvenile Court need not labor this point during a "full investigation" if it is otherwise made apparent that non-criminal treatment would be inconsistent with the future safety of the public. In light of these considerations, the reasons given by the Juvenile Court are sufficient to support its decisions to waive jurisdiction.

Such waivers are an exceptional step and in no way cast doubt on the basic parens patriae philosophy of our Juvenile Courts. As Kent noted, the underpinning concept of guidance and rehabilitation for juveniles is universally accepted in our jurisprudence. See also Note, The Juvenile Delinquents: The Police, State Courts, and Individualized Justice, 79 Harv. L. Rev. 775 (1966). Parens patriae has been specifically found applicable in the Virgin Islands, see Government v. Brodhurst, 5 V.I. 306 (Mun. Ct. 1966). Its dominant role has been confirmed by the Third Circuit on appeal, In re Brown, 7 V.I. 545, 550–51, 554 (3rd Cir. 1970). The policy is so strong that it may be that no degree of seriousness in the offense alone, even if coupled with a juvenile record showing crimes of increasing brutality, will justify a decision to waive jurisdiction. See United States v. Turner, 438 F.2d 839, 841 & n.4 (3rd Cir. 1971) (VanDusen, J.) (semble).

 On the other hand, however, the legislature may make a specific exception for those cases where the serious offense is coupled with a finding that it is apt to be re-

peated if rehabilitation is attempted in a non-criminal environment. Parens patriae is a rule of interpretation rather than enacted law, and juvenile law itself is neither monolithic nor an exercise in single-factor analysis. Rather, it is a statutory creation subject to the usual legislative powers of alteration and exception. See, e.g., In re Dendy, 175 S.W.2d 297, aff'd, 179 S.W.2d 269, 142 Tex. 460; State v. McKinley, 202 P.2d 964, 53 N.M. 106; State v. Gronna, 59 N.W.2d 514, 79 N.D. 673. The especial latitude permissible when formulating juvenile law is illustrated by its history. At common law children were subject to the same criminal sanctions as adults, with the rigor of this rule moderated only by a rebuttable presumption against scienter for those under fourteen. See National Council on Crime and Delinquency, Guide for Juvenile Court Judges 2 (1957); Note, supra, at 775. A separate schedule of punishment and sanctions, serving distinctively juvenile goals, was not introduced in this country until 1899. This was in specific exception to the common law, and in consequence treatment as a juvenile has been considered a privilege rather than a right. See, e.g., People v. Rogers, 308 N.Y.S.2d 568, 62 Misc.2d 312 (state law); Ramirez v. United States, 238 F.Supp. 763 (S.D.N.Y. 1965) (federal law). This does not mean that the privilege may be extended or withheld arbitrarily, of course, but it confirms that the legislature has considerable discretion in placing conditions on the exercise of juvenile jurisdiction.

The Virgin Islands legislature has exercised this power and has elected to make the public safety an important standard in waiver decisions, one which can on occasion override what might be thought in vaccuo to be the ideal rehabilitative conditions. Section 176 provides in the disjunctive that the Juvenile Court may waive jurisdiction if this is in "the best interests of the child *or* of the

public . . . ." 4 V.I.C. § 176 (emphasis supplied). This usage is absent in such well-known Juvenile Acts as the District of Columbia's, see Kent v. United States, supra; but it is found in such others as Pennsylvania's, see United States v. Turner, supra. The legislature's desire to make waiver relatively accessible is further suggested by the recent enactment of a bill to directly lower the age of certain criminal responsibilities to sixteen. See Bill No. 5263 (July 19, 1972). We cannot say this legislative judgment on waiver is irrational. The public interest may certainly be considered paramount; moreover, the easy commission of additional crimes while in juvenile custody is hardly conducive to rehabilitation.

This opinion is not intended to survey all those constellations of Juvenile Court findings which would justify a conclusion that the public safety is threatened. In deciding the cases before us, however, we may identify two. Eugene Martin presents a history of recidivism and escapism, such that it is unlikely that he could be successfully confined in a juvenile institution. Santana is an exceptionally callous young man, and the authorities believe he could be neither rehabilitated nor deterred from future misconduct in the interval before his twenty-first birthday and the termination of juvenile jurisdiction. We will discuss these two cases in sequence.

## A. Escape and Recidivism

By the time of this waiver hearing Eugene Martin had established a pattern of escape and burglary. A lengthy prior record had terminated most recently in a conviction on charges of burglary and grand larceny. At that time he was committed to the custody of the Department of Social Welfare until he reached the age of twenty-one. An officer of the Juvenile Bureau and an officer of the Insular Training School, to which Martin had been

sent, described him as intractable, incorrigible, and a chronic escapee. His arrest on the present charge came during one such escape; cases involving two other incidents were suspended pending disposition of the waiver motion. It appeared during the hearing that the Insular Training School is extremely insecure and that a determined juvenile can escape from it at will. Martin seized such an opportunity after his hearing and was still at large at the time the Juvenile Court waived jurisdiction.

Martin's waiver was specifically based on considerations of public safety. The two officers had testified that he was quick to learn and probably capable of rehabilitation under ideal conditions of training, supervision, and detention. They further testified, however, that there was no chance of this result under the conditions existing and with the facilities currently available to the Department of Social Welfare. The Juvenile Court then announced its waiver, noting in the Order that it "cannot conscientiously say that the minor's interests will be best served by trying him as an adult. On the other hand, it can hardly be said that the minor's or anyone else's interests will be better served by retention of jurisdiction by this Court." With this balance struck, the court's motivating concern then became the fact that from a juvenile institution Martin could "escape at will to commit more larcenous acts."

 The evidence before the Juvenile Court was more than sufficient to sustain its finding of a public danger. It has been said that a juvenile's prior history is not itself a basis for waiver, but becomes relevant only insofar as it casts light on his probable future conduct. Haziel v. United States, 404 F.2d 1275, 1282 (D.C. Cir. 1968). I agree with this but find that the consistency and repetitiveness in Martin's history gives it considerable predictive value. For example, the fact that he has had

prior exposure to juvenile training, and has failed to profit from it, suggests that future rehabilitation is less likely. Reliance upon a similar consideration was upheld in the recent case of United States v. Howard, 449 F.2d 1086 (D.C. Cir. 1971) (Leventhal, J.), even in the face of contrary evidence from other specialists who believed that the defendant's rehabilitative prospects were "very good". Other factors would also work against rehabilitation here. The Insular Training School evidently does not provide programs suitable to Martin's needs; and the fact that he is already subject to the maximum juvenile sentence would free him from a major deterrent against future illegality while in that school.

Given Martin's known penchant for burglary, his poor rehabilitative prospects ought to be countenanced only if he could be securely incarcerated during the experiment. In Howard, supra, the judge was permitted to find the juvenile facility insufficiently secure for that purpose, despite the fact that it was one especially constructed for older and more hardened delinquents. Id. at 1091. The present case is still clearer on this score. The single facility at Anna's Hope must accommodate all juveniles, and its physical weakness is a matter of public notoriety. It may be a regrettable lapse of policy that this situation was allowed to develop. But if the legislature chooses to establish only a relatively open institution, and to treat as adults those who cannot be confined in it, this seems a power necessarily included within its unquestioned power to have set the age of criminal responsibility at sixteen years for all persons.

### B. Insufficient Time for Rehabilitation

 Santana's case raises a different problem, in that he is expected to be neither rehabilitated nor deterred from future illegality in the time before he reaches twenty-

166

one. Under juvenile jurisdiction he would therefore be released while still constituting a risk to the public safety. A longstanding narcotics addiction is one factor making rehabilitation less probable. More importantly, Santana has struck many observers as being particularly mature and hardened for his years. At this preliminary stage of the proceedings, the Juvenile Court was proper in taking judicial notice of another trial, also involving this defendant, which illustrates the point. Shortly before his present arrest Santana was tried as an adult for first degree felony-murder, after a killing of particular brutality, and was found guilty by the jury. That action was dismissed only upon subsequent discovery that he was not eighteen years of age at the time, but only fifteen. A retrial is now pending in the Juvenile Court since at the time of the commission of that offense Santana was beneath the age even of waiver.

The juvenile judge touched upon these considerations as he orally gave his reasons for waiver here, and they are sufficient to support that decision. Moreover, additional supporting evidence may be found in the transcript of that hearing. It seems appropriate to make the transcript available for consideration at this stage. Since the ruling was oral, and the formal order merely incorporated it by reference, it cannot be as complete and orderly as a written opinion; yet for the same reason both the transcript and the reasons for waiver are contained in one document and so are readily accessible. This practice would appear to be supported by the decision in Strickland v. United States, 449 F.2d 1131 (D.C. Cir. 1971). In that case the transcript had been lost and was not available when the District Court reviewed the waiver decision; although the facts are somewhat unclear, the Circuit Court concluded that both the waiver order and its supporting Statement of Reasons were available. The

appeal then concerned the sufficiency of these documents to support the waiver. While concluding that they would, the court noted that "the difficulties surrounding this case could have been avoided had the transcript . . . been available at all times." Id. at 1135. This dictum suggests that the transcript may be referred to to fill in and illuminate the reasons given by the Juvenile Court. Such a practice is reasonable. If the transcript were used to fill in a bare statement that the public safety would be jeopardized, the reviewing court would have to interpose its own judgment as to what particular reasons were most persuasive to that conclusion. But once the Juvenile Court has outlined its reasons, we may explore the information on which they are based without disturbing the factual priorities established by the judge.

If we were to look to the transcript in this fashion, we would find additional evidence supporting the court's judgment that Santana could not be rehabilitated within the time and facilities available. Two officials categorically testified to this effect. See T. 18 (testimony of Walter Julio, Director of the Juvenile Bureau, Department of Public Safety); T. 25 (testimony of John Cummings, Social Worker, Department of Social Welfare). In addition, Mr. Julio submitted a written report which was introduced into evidence as Court's Exhibit No. 1 and is part of the record in this case. T. 19. In that report he stressed that only federal institutions can provide suitable rehabilitative programs, and to secure Santana's commitment to one he "urgently request[ed]" that juvenile jurisdiction be waived. If these statements are accepted, then it is clear that Santana is likely to remain dangerous at the time that juvenile jurisdiction here would terminate. It is also apparent that the judge did accept them, since he indicated in his oral statement of reasons that if Santana were included in the local rehabilitative

program "it would not be fair to [the other minors]." Moreover, we might note parenthetically that the transcript would also support waiver under the set of criteria tacitly approved by the Supreme Court in its Appendix to Kent, if the judge had elected to specifically bottom his decision on that test.

In finding that Santana could not be rehabilitated under juvenile auspices, and that the public safety thus justified waiver, the result reached in the Juvenile Court does not differ greatly from those reached in other jurisdictions. Similar considerations were found adequate in United States v. Howard, 449 F.2d 1086, 1091 (D.C. Cir. 1971). The importance of rehabilitative prospects to the public safety is well illustrated by the history of Kent on remand, see 401 F.2d 408 (D.C. Cir. 1968) (Bazelon, J.). The Circuit Court then held that waiver had been improper, but did so for the narrow reason that Kent was clearly insane and had indeed been found not guilty on some counts for that reason. Under these circumstances rehabilitative goals could be harmonized with the public safety. The Court could procure a civil commitment which, being non-criminal, would not expire with Kent's twenty-first birthday. Cf. 4 V.I.C. § 175. The court noted that this disposition "will assure [Kent's] confinement for treatment for as long as the public safety requires," id. at 412, and cautioned that rehabilitation is to be given the highest priority only "so long as [it] provides adequate protection for society," id. at 411. The strength of this caveat is illustrated by other cases in which insanity was less clear. See, e.g., United States v. Howard, supra, where conflicting psychiatric testimony allowed the Juvenile Court to conclude that the defendant was not civilly committable, and hence waiver was upheld. The present case is still clearer on this score, since Santana's sanity has not been legitimately placed at issue. Other cases have

acknowledged that paramount role of the public safety, even when finding waiver inappropriate in the particular circumstances, see, e.g., Haziel v. United States, 404 F.2d 1275, 1279 (D.C. Cir. 1968) (Bazelon, J.). The District of Columbia Juvenile Court has revised its criteria explicitly to make this an independent ground for waiver. See Uniform Policy Position of the Judges No. 1 (May 18, 1966).

## III. LIMITATIONS

It will be understood that this opinion does not have unlimited reach. Waiver is an extraordinary proceeding and will be appropriate only for a relatively small proportion of juvenile offenders. It is to be considered a regrettable exception to the dominant spirit of parens patriae. More particularly, it will not be an acceptable argument to note that *all* juvenile treatment is conducted in the relatively open atmosphere of rehabilitation, that this is less secure than adult confinement would be, and hence the public safety is necessarily more threatened by this course. The spirit of our juvenile laws will demand a more particular analysis.

Some jurisdictions have established quite stringent procedural requirements in order to assure compliance with this spirit. In the District of Columbia, for example, the Juvenile Court must explicitly and if need be on its own motion canvas possible plans and dispositions short of waiver by which the welfare of the juvenile and the community may be harmonized. The avenues considered, and rejected, must then be listed among the reasons for waiver. See Haziel v. United States, 404 F.2d 1275, 1279 (D.C. Cir. 1968). I do not believe, however, that this device must be read into our own statutory requirement of "full investigation". The Haziel requirement may have been prompted by a tendency in the District of Columbia

Juvenile Court to grant waivers routinely in order to ease their own dockets. See Green v. United States, 308 F.2d 303, 305 (D.C. Cir. 1962). No such tendency has been observed in our own Juvenile Court, and so there is no reason to presume a statutory requirement that it spell out the course of its investigation as well as its conclusions. Moreover, waiver in the present cases is so amply justified that we would be hesitant to use them as the vehicle for announcing a new rule which is unlikely to alter their result.

▇ The Court is nonetheless persuaded that a more elaborate exposition of the reasons for waiver would be desirable. This should assist the defendant on appeal, if he desires to take one, and will also provide additional guidance to the Juvenile Judges. We therefore invoke our supervisory power over the procedures used in the Juvenile Court, see 4 V.I.C. § 77, and will require that future waiver orders touch specifically on certain points. In addition to broad consideration of rehabilitative prospects and the public safety, the Juvenile Court should also make findings on each of the criteria listed in the Appendix to the Supreme Court's opinion in Kent. The court should also state the rehabilitative strategies which were considered during the hearing or developed during its own investigation, and explain why they were rejected. See Haziel, supra. The discussion of these points need not be lengthy, nor should their number dilute the importance of the public safety. Our purpose is instead to assure that a decision as important as waiver is reached while mindful of all relevant factors. Since we have explicitly held that the waivers here were made consistently with all statutory and constitutional requirements, however, this portion of the opinion will have only prospective operation and will not apply to the present cases.

171

The motions to dismiss the informations filed in both cases will be denied.